**JACKSON v. NATIONAL LIFE & ACCI-
DENT INS. CO., Inc.**

No. 13181.

Court of Civil Appeals of Texas. Dallas.
March 20, 1942.

Rehearing Denied May 1, 1942.

Wright K. Smith, of Dallas, for appellant.

Read, Lowrance & Bates, of Dallas, for appellee.

LOONEY, Justice.

The parties will be designated as in the court below. The National Life & Accident Insurance Company, Inc., sued Wiley J. Jackson, beneficiary (the insured having died), to cancel a life policy issued by it to Walter W. Jackson for $1,000, the grounds alleged for cancellation being that the applicant intentionally made false answers in his application for the insurance, of a material nature, which became warranties, upon the faith of which the policy was issued; and that by reason of the fraud perpetrated, the policy never became binding as a contract.

A jury was impaneled to try the case, but, at the conclusion of the evidence, the court took the case from the jury and rendered judgment for plaintiff, canceling the policy and adjudging that the defendant was entitled to receive the premiums paid on the policy, which had been tendered by plaintiff and paid into the registry of court, to all of which the defendant excepted, gave notice of, and perfected this appeal.

The only question for decision is, did the evidence raise a fact issue that should have been submitted to the jury? The undisputed material facts are these: The application for the policy was signed December 8, 1937 (the policy issued December 22, and suit for its cancellation was filed within two years after its date), contained an agreement that each statement made in the application was full, complete, true and without exception (unless mentioned), and was made to induce the execution of the policy for which application was made. Among others, the applicant was asked the ques-

tions following, and made the answers as indicated. Being asked, "Have you ever had any disease of: * * *" (mentioning a number of diseases), followed by this question: "Have you ever consulted a physician for any ailment or disease not included above?" to which the applicant answered "No"; was asked, "Have you ever had any accident or injury, undergone a surgical operation, or been an inmate of a hospital or sanitarium?"; to which the applicant answered "No"; was asked, "Are you deformed, lame or maimed, or is there anything in your personal history not mentioned elsewhere in this application?," to which the applicant answered "No"; was asked "State names and addresses of physicians you have ever consulted and give the occasions by reference to question numbers and letters above."; to which the applicant answered "None."

These answers were made by applicant to Dr. Denton, of Dallas, Texas, plaintiff's local medical examiner, who, having no authority to pass upon applications and determine whether or not the policies should issue, forwarded the application containing applicant's answers to plaintiff's home office at Nashville, Tenn., where it was submitted to, and passed upon by, Dr. Byrd, plaintiff's assistant medical director at Nashville, who approved the application, and the policy was issued by plaintiff in reliance upon the truthfulness of applicant's answers hereinbefore set out, and in ignorance of any fact or facts to the contrary.

These answers of applicant to the questions heretofore set out were knowingly false, material to the risk, willfully and purposely made to deceive plaintiff and induce the issuance of the policy; the undisputed facts being that: Approximately four months before applying for the insurance, Walter W. Jackson was injured in a collision of motor cars; sustained a concussion of the brain; was rendered temporarily unconscious; was first taken to Parkland Hospital in Dallas, but before reaching the hospital, was seized with a fit or convulsion; suffered severe headache in the frontal region; his arms and legs moved wildly; had decided tremors throughout his body; was conscious only in a general way that something had happened. This attack lasted several hours, was relieved somewhat, but his severe headache continued, and after about six hours was sent home; early next morning, had another fit or convulsion, similar to the first, and then entered St. Paul's Hospital, Dallas, Texas, for treatment; was under the treatment of two physicians from August 9 to 14th; continued to suffer from headache until a spinal puncture was done and a large amount of fluid withdrawn, since which time he has not been completely unconscious; went to his home but, not being able to rest, under the advice of his physician returned to St. Paul's Hospital on August 23, where he was under the treatment of the same two physicians until August 29, 1937. Dr. Byrd, plaintiff's assistant medical director, testified that he would not have approved the application, and that no policy would have issued, had he known the facts, because, he said, "Such a history would indicate to me that the subject was not an insurable risk. Sufficient time had not elapsed since the injury for any one to know definitely whether or not he had completely recovered or would have further complications."

■ Although we do not regard the immediate cause of insured's death as a material matter to be considered in connection with the question as to the right of plaintiff to have the policy canceled, yet, we think, the evidence clearly shows that insured fell and suffered a fracture of his skull, as the result of a convulsion produced by a blood clot formed on the brain after the original injury was sustained. The facts show that on August 25, 1939, a few days over two years after being injured, the insured fell on a concrete floor of a filling station, fracturing his skull, from which, or the operation which followed, or both, he died on August 29th. No one saw the assured when he fell. The death certificate, which was not impeached or explained, recites that he had a convulsion and fell, striking his head on the running board of a car; that he had been subject to convulsions for the past year; and Dr. Nash, who attended assured at the hospital where he was taken for treatment after he fell at the filling station, testified that insured began to have convulsions at intervals about six months prior to his death. Dr. Schaefers, one of the physicians at St. Paul's who treated the applicant, gave testimony to the effect that within a year, a blood clot might develop on the surface of the brain; probably earlier than that, but might not show symptoms for a year or longer, sometimes as long as five years, and that even where, apparently, a simple concussion occurs, it

is probable that a fibrous condition or blood clot may develop within twelve months.

■ The uncontradicted evidence, in our opinion, conclusively shows that the statements made by Walter W. Jackson, in his application for the policy, to the effect that he had never suffered an accidental injury, or undergone a surgical operation, or been an inmate of a hospital, or consulted a physician, were false, material to the risk, willfully made with the intention to deceive plaintiff and cause the issuance of the policy; in fact, did deceive plaintiff and cause its issuance; hence, it conclusively appearing that no binding insurance contract ever came into existence, the court did not err in the procedure taken.

The gravamen of the action is based upon the idea that a binding contract of insurance never came into existence, because the issuance of the policy was induced by false statements as to facts material to the risk; that such statements, being false and fraudulent, became warranties under Sec. 4, Art. 4732, R. S., providing: "That all statements made by the insured shall, in the absence of fraud be deemed representations and not warranties." We do not think it can be said that the policy, issued in reliance upon the false statements made by applicant, was binding from the date of its issuance, unless plaintiff might be able, in litigation subsequent to the death of the applicant, to secure a jury finding that the facts falsified and concealed were material to the risk, or that the conditions concealed were reasonably calculated to have contributed to this death. We think the contrary doctrine was held in Aetna Life Ins. Co. v. Shipley, Tex.Civ.App., 134 S.W.2d 342, 346–347, where the court said: "In all fairness, should not Shipley have advised the insurance company of all the facts, to the end that it could have made such inquiry and investigation as it saw fit to do, before the policy was issued? We believe so. * * * It seems obvious to us that it cannot in justice and reason be held that in a case, such as is before us, the applicant for insurance is not duty bound to disclose to the insurance company, in the application for insurance, the fact of his bodily ailments unless the jury first finds that such ailment or ailments are reasonably calculated to have contributed to his death."

■ It is the privilege, we think, of a life insurance company to require an applicant for insurance to make truthful answers to all questions touching his health, his physical and mental condition and medical history, for it is upon faith in these answers that the policy is issued, and it is the province of the company to determine the materiality of the questions submitted, the facts disclosed, and facts concealed; for these form the basis for the proposed contract and, if falsified, no contract results, even though a policy issues. The rule seems to be that false statements in an application for life insurance, as to prior consultations with and treatments by physicians, are material and will void the policy issued in reliance thereon. The rule on this point, as announced by our courts, is stated in 37 C. J. 463, Sec. 179, as follows: "In some jurisdictions the misrepresentation must be both material and fraudulent, but if the answer is untrue, and the matter is material, the insured necessarily knows that it was not true when he made it, the intention to deceive is necessarily implied. Generally, statements as to consultation with or attendance by a physician, whether warranted to be true or not, are regarded as material to the risk, so that if false, whether intentionally fraudulent or made in good faith, a policy issued in reliance therein may be avoided, since insurer's knowledge or ignorance of the fact represented would naturally influence it in making the contract, estimating the degree and character of the risk, or fixing the rate of premium."

■ Under the title, Cancellation of Instruments, the doctrine is announced in 7 T.J. 912, Sec. 20, that: "Misrepresentation as to a material fact, inducing the execution of the contract, whether innocently made, or with intent to deceive, constitutes a fraud authorizing cancellation where it appears that the person to whom the statement was made had a right to rely thereon, and that he did so to his injury." The truth of the representations made by applicant regarding his physical condition and medical history were conditions precedent to the validity of the contract issued thereon, and the Company, having discovered the falsity of these answers, had a right to repudiate the contract and sue for its cancellation. See Great National Life Ins. Co. v. Hulme, 134 Tex. 539, 136 S.W.2d 602; American Nat. Life Ins. Co. v. Lawson, 133 Tex. 146, 127 S.W.2d 294.

We think the judgment below should be, and is hereby, affirmed.

Affirmed.