**UNITED STATES of America, Appellant,**

v.

**Jeanice STRATTON, Appellee.**

**No. 15836.**

United States Court of Appeals Fifth Circuit.

May 8, 1956.

B. Jenkins, Middleton, Paul A. Sweeney, Attys., Dept. of Justice, Washington, D. C., William M. Steger, U. S. Atty., John L. Burke, Jr., Asst. U. S. Atty., Tyler, Tex., Warren E. Burger, Asst. Atty. Gen., for appellant.

Warren G. Moore, Tyler, Tex., Ralph Prince, Gladewater, Tex., James R. Lewis, Tyler, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

Brought by the widow of Kenneth Bennett Stratton, the suit was to recover on a National Service Life Insurance policy for $10,000 issued to Stratton on May 1, 1942, during and in consequence of military service.

The claim was: that on February 9, 1953, while the policy of insurance was in full force and effect, the veteran had died, the autopsy indicating a brain tumor as the primary cause; that plaintiff had made a claim for payment of the policy upon the Veterans' Administration; and that said claim had been denied and payment refused.

The defense was: that the insured had failed, within the grace period, to tender the premium due on December 1, 1951, and the policy had lapsed for nonpayment; that, though on January 17, 1952, the veteran did submit an applica-

tion for reinstatement on the form "Statement of Health"[1] and the policy was reinstated, the answers "yes" to question No. 1 and "no" to question No. 2 were falsely and fraudulently made; and that the reinstatement was not effective because obtained by fraudulent misrepresentations.

Upon the issues thus made, the cause was tried to a jury, and, defendant's motion for a directed verdict denied, there was a verdict and judgment for plaintiff.

Appealing from the judgment, the United States is here insisting: that the evidence[2] established as matter of law

1. "Statement of Health.

"As a condition to the reinstatement of this insurance, I certify that the answers to the following questions are complete and true to the best of my knowledge and belief. I understand that statements made by me in this application are relied upon in reinstating insurance: that any deception or false statement either by inference, omission, or otherwise may result in cancellation of the insurance or in refusal to pay a claim on the policy: that in either event premiums are not returnable.

"1. Were you in as good health on the date of tender shown on the face of this letter as you were on the due date of the premium in default?

"2. Have you been ill, or suffered or contracted any disease, injury, or infirmity, or been prevented by reason thereof from attending your usual occupation, or consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere, in regard to your health, since the due date of the premium in default?

"(If answer is 'yes' give all dates and full particulars, and attach, if readily available, a certificate of the practitioner or hospital where treated, with diagnosis, prognosis and treatment.)"

2. Kenneth Bennett Stratton was an intelligent, energetic, hardworking produce manager and salesman for a wholesale grocery firm. Until January 1952 he appeared to be in good health and to the best of his wife's recollection had not missed a day's work in three years, except "possibly for a cold or something like that". He drove himself to work, however, and was a tense sort of person. Apparently his only complaint, according to his wife, was a "nervous stomach" which occasionally caused him to lose his food.

On January 7, 1952, however, the day before he tendered the overdue premiums, Stratton suffered a complete blackout or loss of consciousness for at least thirty minutes. He was taken to the Gladewater Municipal Hospital, Gladewater, Texas, where he was admitted in an unconscious state. At the time of his admission or shortly thereafter, he vomited blood. Dr. Eichenlaub of the hospital staff immediately began treatment in an attempt both to restore consciousness and to diagnose the cause of the blackout. Stratton's blood sugar and blood calcium were tested while he was still unconscious in order to determine whether hypoglycemia (blood sugar deficiency) or hypocalcemia (blood calcium deficiency) might be the cause of his condition. The insured "finally regained consciousness", but was kept in the hospital four days, through January 10, 1952, in order to complete the studies being made of the possible cause of the blackout and for further treatment. The latter included treatment for the stomach condition and for soreness in Stratton's back, which he believed to have been injured in his fall when he lost consciousness. On January 8th, the day after the blackout, his condition was "much improved" but he was allowed only bathroom privileges. This was the day on which Stratton tendered his remittance to the Veterans Administration.

The only definite diagnosis reached by the medical staff of the hospital was with reference to the apparent bleeding from the stomach, which was diagnosed as a bleeding peptic ulcer. Treatment for that condition was immediately instituted and continued for several months on return visits to the hospital after the insured was discharged. An X-ray examination indicated a crater in the lining of the stomach which might or might not have been an ulcer. There was conflicting evidence as to whether it might have been medically possible for the vomiting of blood (hematemesis) to have been caused by the insured biting his tongue rather than by a peptic ulcer or other internal condition.

No definite diagnosis of the cause of the insured's unconsciousness was reached by the hospital staff, however, since the results of their tests were negative. Among the possible causes under consideration were epilepsy and, as noted, hypoglycemia and hypocalcemia, but only the last two could be tested for at the hospital. The possibility of epilepsy or other brain in-

that the certificate of the insured, made on January 17, 1952, a week after his release from the hospital, that he was (1) in as good health on January 8, 1952, the day he had tendered the premiums and the day following his seizure, as he had been on December 1, 1951, the day his defaulted premium was due, and (2) that he had not been ill, had not been prevented from working by reason of illness, and had not consulted a physician since December 1, 1951, was false and fraudulent and the reinstatement was fraudulently obtained; and that the judgment should, therefore, be reversed and here rendered for defendant.

The appellee, pointing out that to avoid a reinstatement of a policy for fraud there must be a finding, or evidence showing as matter of law, that the assured made a false representation (1) in reference to a material fact, (2) with knowledge of its falsity, and (3) with intent to deceive; and that action was taken in reliance on the representations; insists that, within the teachings of Pence v. United States, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510, and Cardwell v. United States, 5 Cir., 186 F.2d 382, the evidence did not establish fraud as matter of law but only made an issue for the jury which was resolved in appellee's favor. Pointing to the difficulties attending and the lack of precision and certainty in the diagnosis made in connection with Stratton's hospitalization and medical examinations, appellee insists that the deceased was never definitely advised and he did not know that his condition was fatal or even serious.

Appellant, on its part, putting its reliance in Pence v. United States, supra, and in our case of McDaniel v. United States, 5 Cir., 196 F.2d 291, urges upon us that the answers given, especially the answer to question No. 2, are so directly contrary to the facts, so unequivocally false, that they could not have been made without knowledge of their falsity and without fraudulent intent. It particularly insists that the action of the decedent in tendering the overdue payment on January 8th, the day after his serious attack and hospitalization, together with his act in executing the certificate for reinstatement on January 17th, the day before his appointment for an electroencephalogram examination, are inconsistent with any other conclusion than that, with knowledge of his condition and that he was not entitled to have the policy reinstated, appellee knowingly and fraudulently deliberately made false statements to secure reinstatement.

We think appellant has the right of it and that, upon the undisputed facts, the case is ruled by the Pence and McDaniel cases.

It must be conceded that particular cases of reinstatement have presented difficulties in correctly resolving the question whether the evidence presents an issue for the jury or a question of law for the court, and that in some of the cases the courts seem, in deference to the jury verdict, to have gone dangerously close to abdicating their judicial function. At first blush, this may seem true of the Cardwell case. When, however, the facts of that case are carefully examined and particularly as they are analyzed and appraised in the opinion, it will, we think, be clearly seen that that case is not at all in conflict with the result reached here.

In the McDaniel case, in which sat two of the judges who had decided the

volvement could not be eliminated without an electroencephalographic tracing for which the hospital lacked the necessary equipment. Dr. Eichenlaub therefore wrote to Dr. Arthur J. Schwenkenberg, a neuro-psychiatrist in Dallas, on or about Jan. 10 or 11, 1952, requesting an appointment for Stratton for an electroencephalographic examination. An appointment was arranged for Jan. 18, 1952.

In informing Stratton of the appointment, Dr. Eichenlaub advised him that, while the tests thus far were negative, the examination was not yet complete, and that without the electroencephalogram the cause of the blackout was still undetermined. He told Stratton that his condition might or might not be serious and that further observation was necessary.

Cardwell case, one of them the organ of the court, we undertook to point out carefully the differences in the facts of the two cases and the sameness of the conclusions.

In Cardwell's case we pointed out that the assured was a layman, a carpenter who "not only did not know that he had a serious disease but on the contrary had been advised by his physician that his trouble was imaginary and that there was nothing physically wrong with him". In that case the lapse of the policy had occurred in 1945 and the reinstatement was applied for and the questions answered by his wife two years later. According to her testimony he worked continuously in his trade of carpentry until the latter part of 1948. The only information he had had which might be considered as contrary to his answers was that in November of 1946, nearly a year before he had made his application for reinstatement and two years before he was found to have cancer, he had consulted a Dr. Bell on several occasions for pains in the abdomen, loss of weight and nervousness, and a Dr. Smith for an injured hand and abdominal pains. Dr. Bell was dead when the case was tried, but Mrs. Cardwell, who had filled in the answers claimed as false, swore that Dr. Bell had told her deceased husband that his trouble was imagination, there was nothing wrong with him, and the evidence showed that Dr. Smith had diagnosed his abdominal pains as a simulated appendix and did not give him any treatment.

Under these facts the court concluded: that the insured had every reason to believe that the ailments, of which he had complained to Dr. Bell, were of a minor and inconsequential nature; that it was not unreasonable for the jury to infer from the evidence that the applicant in good faith did not consider his visits to the doctor of sufficient importance to report them if indeed *"he had this detail in mind when he signed the prepared application for reinstatement"*.

In McDaniel's case, the decedent was a college graduate and a lawyer who, though not told that he had Hodgkins disease, knew that he was seriously disabled and with that knowledge had applied for and received a seventy percent disability compensation rating.

We think the facts in this case, including what was physically happening to the deceased at the very time that he was seeking by statements, which he knew to be false, to obtain a reinstatement of his policy, are of such force as to compel the conclusion that no honest person could reasonably have given the false answers he gave without intending to defraud, and that no jury could have reasonably found that he did not so intend.

The judgment is reversed and here rendered for the appellant.

CAMERON, Circuit Judge (dissenting).

One essaying to judge of a man's intent must look inside him,—at his heart, his mind, his will, his soul. Many intangibles and subtleties are involved. The printed page is not a good medium for making those impalpables articulate.

The Judge and jury, co-laborers in the solution of this fact issue in the Court below, saw the witnesses and heard the testimony from which intent must be inferred. They were in much better position to reach a correct conclusion than we are.

Fraud is never presumed and he who would sustain it as an affirmative defense must establish it by evidence which is clear, convincing, decisive. Where, as here, fraud is charged against one whom death has robbed of the chance to speak for himself, the presumption of honesty and fair dealing is especially strong. Mr. Justice Storey expressed the idea in these words many years ago: [1]

"Fraud or breach of trust ought not lightly to be imputed to the living; for the legal presumption is the other way; and as to the dead, who are not here to answer for

1. Prevost v. Gratz, 6 Wheat. 481, 496–497, 5 L.Ed. 311.

themselves, it would be the height of injustice and cruelty to disturb their ashes and violate the sanctity of the grave, unless the evidence of fraud be clear, beyond a reasonable doubt."

The pattern for deciding this case is set by Cardwell v. United States, 5 Cir., 1951, 186 F.2d 382, to which, of all our cases, this one bears the greatest resemblance. In Cardwell we held that the trial Court committed error in taking the case away from the jury. Here, we are taking a much longer step. We are setting aside the fact-findings of a court and jury who were in best position to reach a just conclusion on this issue of fact. I would affirm.