**Rosa Lee ROOSTH, Appellant,**

v.

**LINCOLN NATIONAL LIFE INSURANCE COMPANY, Appellee.**

**No. 17426.**

United States Court of Appeals
Fifth Circuit.

July 30, 1959.

Rehearing Denied Sept. 4, 1959.

Hutcheson, Chief Judge, dissented.

172

Charles F. Potter and Spruiell, Lowry, Potter, Lasater & Guinn, Tyler, Tex., for appellant.

Thomas B. Ramey, Jack W. Flock, Tyler, Tex., Gordon C. Reeves, J. T. Deitschel, Fort Wayne, Ind., Ramey, Brelsford, Hull & Flock, Tyler, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

CAMERON, Circuit Judge.

December 24, 1956, Dr. Harold Roosth (insured), a practicing physician in Tyler, Texas, applied to The Lincoln National Life Insurance Company (insurer) for $50,000 life insurance with appellant Rosa Lee Roosth, his wife, as beneficiary. The policy was issued on the same date after the usual medical examination and was delivered to insured soon thereafter. After paying two monthly premiums the insured died February 7, 1957, the death certificate showing as the cause of death "Sub-arachnoid hemorrhage due to ruptured aneurism." The insurer declined the beneficiary's claim under the policy on the ground that insured had made false statements and misrepresentations in his written application for the policy knowing they were false and making them with intent to deceive the insurer, claiming that said false statements and misrepresentations were material to the risk assumed by insurer and were relied upon by it and it was induced thereby to issue the policy; and that the insured was not in good health when the policy was issued and delivered to him.

This civil action brought by the beneficiary was tried before court and jury and, after prolonged deliberation, the jury reported its inability to agree upon a verdict and was discharged. Thereupon the court, after hearing argument and considering briefs, entered judgment granting insurer's motion for directed verdict based upon the averment that each of the defenses relied upon by it had been established by "the uncontradicted and/or great preponderance of the evidence." The question presented by this appeal is whether the defenses relied upon were established by evidence of such character that the court below was justified in deciding that no jury issues were presented, and that the defenses should be sustained as a matter of law; and that the insurer had not waived, or was not estopped to prevail on, its motion for directed verdict by reason of notice of facts omitted from the application it acquired prior to the issuance of the policy. A careful reading of the record and briefs convinces us that, under Texas law, the evidence required that the issues be decided by the jury and that it was error to decide them as a matter of law.

The trial below was prolonged and the record is made up largely of the testimony of nine doctors who gave their

opinions based, to a large degree, upon hypothetical questions. Without doubt, there is support in the record for a jury finding in favor of the insurance company, but that is not the question which is before us. Ours is the duty to search the record to see if it contains credible evidence from which the jury would have been warranted in finding for the appellant. The opinion, therefore, will be confined largely to pointing out the evidence favorable to the appellant and the law of Texas under which, in our opinion, a case for the jury was made out.

A few fundamental facts should be kept in mind as the details are considered. The first is that Lincoln made a specialty of substandard risks and its premium charges were based accordingly. The annual premium normally applying to the policy issued to insured was $1,094 per year, while the charge made for the policy issued to him was $1,922 per year, an uprating of 74.7 per cent. The insurer knew that the doctor had had a myocardial infarction, commonly known as a coronary thrombosis, in 1948, and that the American General Insurance Company had, five years thereafter issued him a rated-up policy.[1] Insured knew that he was a permanent cardiovascular cripple and, despite his comparative youth, had cut down on his activities to protect himself from future attacks. He was inevitably heart conscious and was probably never free from a measure of anxiety and foreboding. The insurer also knew this. That occurrence was the basic ingredient of the contract between the two and the con-

geries of considerations attending it, the causes, the concomitants and the consequences were logically taken into account in the execution of the contract, and every act by the parties in connection with it should be interpreted in the light of this fundamental fact.

The idea of insurance originated, not with the insured, but with the insurer. The insured felt sufficiently encouraged concerning his recovery and general physical condition to go in with his brother, also a doctor, and construct a clinic, which was occupied in the year 1956. Insured was exploring the covering of the mortgage on the clinic by what was referred to as "mortgage insurance." But Lincoln's agent learned of the situation and importuned insured to purchase life insurance instead, sending in to Lincoln on Nov. 1st an inquiry whether it would be interested in writing it. The amount desired by insured was $26,000, and the application first signed by him November 10, 1956 was for a policy in that amount. The agent inserted in that application the request that an additional policy in the amount of $24,000 be issued. The physical examination by the company examiner, Dr. C. B. Young, was based upon the November 10th application. Insurer's agent, however, testified that the policy was issued on the application dated December 24th, but upon the medical examination made November 11th.

Lincoln pled affirmatively that insured willfully made false answers to specific questions asked him by the medical examiner, as set out in the footnote.[2] It is

1. The record reveals that Lincoln was reinsurer of some of American General's risks and that they swapped information and cooperated in determining whether applications for insurance would be accepted.

2. "9. Mother Age at Death 40 Cause of Death—Childbirth."

"11. Have you now any disease or disorder? If yes give full particulars." Answer: "No."

"13. Have you ever been in a hospital, clinic, sanitarium or institution for ob-

servation, treatment or operation? If so, give date and details * * *."
Answer:
"Medical Center Hosp. Nov. 1955.
Mother Frances [Hospital]
Hemorrhoidectomy 1950
Porter Bailes, Jr. [Surgeon]
"14. Have you ever had any of the following diseases or symptoms? a. Apoplexy, Paralysis, Epilepsy, Loss of Consciousness, Dizziness, Nervous Breakdown, Headaches." Answer: "No."
"g. Has any physician in past five years found your blood pressure above normal?" Answer: "No."

first complained that insured misrepresented the cause of the death of his mother. Since insured was thirteen years of age at the time of her death, it is clear that he knew nothing of the cause and the answer on his application is bound to have been the repetition of what he had heard. His brother explained that family history revealed—as the brother expressed it, they were taught—"That she died from a kidney condition resulting from childbirth." That is essentially what the death certificate showed.

The Company introduced evidence that, in 1950, insured told someone making a physical examination of him that his "mother died at 39 of cerebral vascular accident." His recollection then was no better apparently than it was when he applied for this insurance. At the time of the application he gave his mother's age at death as 40. At the time of the asserted admission against interest in 1950 he gave her age as 39. The death certificate showed that she was 45. If the answer should be considered of any consequence, the jury had a right to believe that the insured gave the best information available to him. Especially is this true when, on the same application, he showed that his father died at the early age of 62 of coronary thrombosis, and the evidence is replete with the showing that his brother was the victim of extreme hypertension for which a serious operation was performed in 1950.

Skipping over to question No. 14(a) concerning seven listed afflictions, including dizziness and headaches, there is abundant evidence that insured had never suffered from dizziness or headaches of any consequence. The evidence to the contrary can serve only to make this a jury question.

The remaining questions with respect to which the insurer claims false and fraudulent misrepresentations may be grouped, because the same evidence relates to all of them. The insured answered, in response to question 13, Note 2, supra, that he had been in two hospitals, one in 1955 and one in 1950. He did not answer that he had never been in any other such institution. Moreover, the question related only to "observation, treatment or operation." The Company's chief point about this answer is that insured had, in November, 1950, undergone a complete physical examination by the doctors of the Smithwick Clinic at Massachusetts Memorial Hospital in Boston. In that connection, the evidence showed that insured was not admitted to said institution as a patient or for treatment. His check-up was a mere incident to his trip to Boston to take his brother who was seriously ill of hypertension, and the insured merely submitted to the general examination during the time he was detained there waiting for his brother to develop enough strength for the serious operation.

The most serious admission against interest relied upon by appellee was contained in the case history which was taken from insured on this occasion. The intern taking the case history made this note: "About four years ago after discharge from army with no reservation it was noted that he had a BP of 160/100–110. He was completely asymptomatic until the middle of September, 1948, when he had two weeks of 'indigestion' followed by a full blown posterior myocardial infarction. He recovered and slowly has increased his activity to 5–6 hours of work (internist) a day. Since the coronary he has ceased smoking and has been taking 150–200 mg of dicumarol every other day, following it with a prothrombintime once a week."

The physical examination then conducted showed an average lying blood pressure of 186/129, but it fell markedly after rest and, under sedation, reduced to 110/70; the testimony disclosed also that the eyes were "clear," that the heart was

"h. Have you ever had X-ray, electrocardiogram or blood studies? If so, give full particulars." Answer: "No."

"i. Have you consulted any physicians or practitioners the past five years for any other causes?" Answer: "No."

not enlarged, and that the electrocardiogram was normal.

In connection with this evidence it should be considered that Lincoln, in its manual of instructions to medical examiners, advised that blood pressure history beyond five years should usually be disregarded; and, as to more recent history, the following instruction was given: "History three to five years ago—if highest systolic in history 3 to 5 years ago was less than 170 and highest diastolic less than 106, disregard * * *."

Several things connected with the 1950 checkup are worthy of note. One is that the history given by the insured to the Boston doctors began with his discharge from military service and included the period of his coronary thrombosis and ended more than six years before the application for insurance; and the moderately elevated blood pressure was manifestly connected in insured's mind with the thrombosis experience.

The examination in 1950 by the doctors of Smithwick Foundation showed insured's blood pressure to be high, but the other tests for hypertension were negative. At that time, insured was scarcely two years away from the grueling experience of the "full blown myocardial infarction" and he was in Boston with full responsibility for a very sick brother, charged with the duty of deciding whether a serious operation should be performed. No doctor who testified held the idea that such an experience would not of itself produce an unusually high blood pressure resulting from nervousness and worry. That the elevation of pressure then discovered was connected with emotional stress is buttressed by the fact that, when the stress was eliminated by sedation, his pressure dropped to the subnormal figures of 110/70.

Under like circumstances as those detailed with respect to the first visit, insured was examined at the same institution Nov. 25, 1951,[3] and again in June, 1953. Both times, the blood pressure levels were well under those Lincoln had established as such a safe standard as to be disregarded.

In connection with that evidence, it should be noted that the insured's doctor brother testified that he had, during the years, taken the insured's blood pressure on numerous occasions and had never found it high; and Dr. Ruskin testified substantially the same thing. Except, therefore, for the one time in 1950 when insured was under such tremendous nervous strain, there was no showing that insured's blood pressure ever exceeded that which Lincoln instructed its examiners to disregard. In addition to this, insured's blood pressure was apparently satisfactory to American General when it issued its policy in 1954, and was 130/85, as noted by the insurer's examiner on the report of examination of insured upon which this policy was issued. Moreover, on the preliminary report made Nov. 1, 1956, as a feeler to determine whether Lincoln would be interested in issuing the policy, it was noted that a current or recent 12-lead electrocardiogram would be required by it.

During all the years of their association in the practice of medicine insured had never mentioned to his doctor brother that he suspected that he was suffering from hypertension of any sort; nor had he mentioned the subject to his doctor (Ruskin) nor to his wife.[4]

Appellee urges that the fact that insured took the drug Raudixon sporadical-

---

3. The average blood pressure found in 1951 was, lying, systolic 138, diastolic 86, and standing, systolic 140 and diastolic 99; in June, 1953, the figures were lying, systolic 148, diastolic 92, and standing, systolic 136, diastolic 96.

4. This Court indicated, in the recent case of World Insurance Co. of Omaha, Neb.

v. Pipes, 5 Cir., 1958, 255 F.2d 464, 467, that the fact that the insured there never told his family or close friends that he had nephritis was strong support for the finding of the trial judge that, if he did have the disease, he did not know it.

ly was indicative of the fact that he knew he was suffering from hypertension. The doctors disagreed about the properties of this drug, some considering it primarily a good tranquilizer and only the mildest remedy for hypertension. It was also shown that the insured followed at times a salt poor diet. Such a course was indicated for hypertension, but it was also indicated for loss of weight, which insured was constantly trying to achieve, and for the lessening of the likelihood of recurrence of coronary thrombosis, which was a constant source of worry to him and a logical explanation for much of the proof upon which appellee places the greatest reliance.

If insured was suffering from hypertension, there was ample proof that it was not essential hypertension, that is, chronic or persistent, amounting to a disease; but was occasional hypertension resulting from the fact that he was a tense individual, reacting spontaneously to such stimuli as worry, excitement, frustration. Those closest to him stated that he appeared to be in good health, led a normal life, and did not direct his effort at avoiding strain and tension which would ordinarily be expected of a doctor who suspected that he was the victim of essential hypertension. The foregoing brief analysis demonstrates that reasonable minds would probably reach different conclusions with respect to the questions whether insured had hypertension at all and if so, its character; whether he knew of the condition if it existed and considered it important; whether he deemed it a part of the thrombosis episode and other like questions. That being so, they presented issues of fact and not of law.

The testimony of Dr. Ruskin was of particular importance to appellant. He was a professor in the University of Texas and had written some eighty papers on cardio vascular diseases. He first examined insured in 1949 and continued to see him and confer with him through the years until the end of 1956. He had never found any evidence from his extended examinations that insured had hypertension in any form, and it had never been mentioned to him. While on the stand he told of writing a letter in February, 1955 to American General Life Insurance Company, which is reproduced in the margin.[5]

Mr. Balay, underwriter for Lincoln National, admitted that the letter was in Lincoln's file. The letter was submitted to Lincoln by American in connection with insured's application to American for insurance. Lincoln reinsured a great many of American General's risks, and it was the practice of the two companies to exchange information.[6] Mr. Balay al-

5. "American General Life Insurance Company, Houston 1, Texas.
    "Attention: Dr. Ghent Graves, Medical Director
Dear Mr. Graves:
    "Dr. Roosth has been under my care since December 2, 1949, at which time the second ECG sent you was taken. He had a myocardial infarction in August of 1948; was treated in Tyler and recovered uneventfully. At that time G. I. series, gall bladder series barium enema, all negative. I have seen him frequently until June 1954, during this time he has never had any symptoms and his physical examination, including size of heart and fluoroscopy of the heart have always been negative except for blood pressure findings—highest on December 2, 1949, 105/100, but always since then below 140/90. He has taken excellent care of himself, including prolonged anticoagulant therapy under my direction. Report from Massachusetts Memorial Hospital on June 1943 noted essentially the same findings and ECG (Q2 and Q3). Urinalysis blood counts, sedimentation rates, all normal.
    "Prompt return of ECGs will be appreciated.
                    "With best regards,
                    Sincerely yours,
                        Arthur Ruskin, M.D.
                        Assoc. Prof. Int. Med.
                        Univ. of Tex. Med. Br.
                        Galveston, Texas"

6. The doctor Ruskin letter referred to an examination at Massachusetts Memorial Hospital in June, 1943, but he explained that this was a typographical error and

so was examined concerning confidential reports made by investigators who had contacted people who were close to the insured and the report showed him to be a man in apparent good health and one who worked regularly.

This letter of Dr. Ruskin's, taken in connection with the underwriter's testimony, would warrant the finding by the jury that the insurer was in possession of facts sufficient to put it upon inquiry at the Massachusetts Memorial Hospital, and that failure so to do would amount to a waiver of the claim that the appellant is barred from recovery by failure of the insured to reveal the examinations made in Boston. At all events, the evidence has persuasive force towards warranting the jury in finding that the insurer did not rely on such failure of the insured to disclose the fact of said examination.[7]

A careful reading of the entire episode involving the examinations by insured in Boston leads to the conclusion that failure to reveal these examinations is not nearly as damaging to appellant's case as the Company contends. At all events, the evidence, considered in connection with the countervailing proof on appellant's behalf, raises nothing more than a jury question on this phase of the case.

Much of what has been written applies to the contention of appellee that the insured gave knowingly false answers to questions 11 and 14(g) and (h).[8] From what has been said above it is clear that insured did not commit any fraud when he answered that he was not at that time suffering from any disease or disorder.[9]

This brings us to the alleged fraud in answering subparagraphs (h) and (i) of Question 14, asking whether insured had had X-ray, electrocardiogram or blood studies, and whether he consulted any physicians or practitioners the past five years for any other causes. In judging insured's answers to these questions, it must be borne in mind that he had consented to a trial inquiry on November 1st, had signed an application on November 10th, and a subsequent application on December 24, 1956, in all of which he had disclosed his myocardial infarction of 1948 and the fact that the American General Insurance Company had rated him up because of the increased risk resulting from it. Without dispute he had had many electrocardiograms made and had been in constant touch with Dr. Ruskin and his brother in connection with the aftermath of the 1948 seizure. Dr. Ruskin testified, for instance, that in November or December, 1956, Dr. Young (Lincoln's examiner) and insured telephoned him long distance several times in connection with "a development of immature contractions or extra beats, skips and jumps of his heart which he was concerned about." The doctor did not consider the development of consequence, stating that they frequently occur following myocardial infarctions as well as in cases of perfectly normal individuals "when they are nervous, or exhausted." Manifestly insured had no cause to withhold from the insurer the information that he had consulted these doctors frequently.

Anyone would know that a coronary patient remains heart conscious and is

the date should be 1953. The content of the letter shows that the date is incorrectly stated, because it refers to an examination made after insured's heart attack in 1948.

7. Perry v. Citizens Life Ins. Co., Tex. Civ.App.1942, 163 S.W.2d 743; Terry v. Texas Prudential Ins. Co., Tex.Civ. App.1935, 77 S.W.2d 761; American Fire & Casualty Co. v. Eastham, 5 Cir., 1950, 185 F.2d 729; and Pilot Life Ins. Co. v. Pulliam Motor Co., 4 Cir., 1956, 229 F.2d 912.

8. It appears that there is no evidence indicating that insured's answer was false when he gave a negative response to the question whether any physician had found his blood pressure above normal within the past five years.

9. Excepting, of course, the disabilities following the heart attack of 1948, which the court below and all parties except from the questions presented.

reminded of his disability by the necessity of taking medicine constantly. The form of the questions is such that insured could logically have thought that they referred to his consultation with doctors, causing electrocardiograms to be made, etc., with respect to disabilities other than those connected with the 1948 seizure. At least, the jury was justified in finding that he did honestly so construe the questions, even if they thought that he was mistaken. The seizure of 1948 was an open book and insurer was given opportunity, at its leisure, to make any investigation it desired with respect to it and its consequences and presumably it did so. In judging insured's intent, his answers must be considered from the viewpoint of what was in his mind when he gave them.

But brief consideration need be given to the contentions which appellee urges so fervently, based upon hindsight. These are predicated upon the death certificate issued to cover the demise of insured and the autopsy performed with the consent of appellant. The death certificate furnished by the attending physician of insured showed that the condition directly leading to death was subarachnoid hemorrhage and the antecedent causes were ruptured aneurysm due to Circle of Willis. The parties agree that, if the cause of death was that stated in the certificate, there would not be proof that the misrepresentations relied upon were material or that they increased the risk, because supposed hypertension would not be embraced within the cause as certified.

But the Company seeks to avoid the statements of the death certificate, claiming that the autopsy demonstrates that the certificate is in error and that death resulted from a cause to which hypertension would be a contributing factor. Much of the hardest fighting revolved around this conflict between the death certificate and the autopsy as established by the report and the testimony of the doctor who made it. The Company's witnesses gave their opinions that, if the findings of the autopsy were correct, the insured must have died of hypertension. Appellant's doctors disagreed. Much of the expert testimony of appellee is discounted because the doctor who performed the autopsy admitted that, although he did not find evidence of an aneurysm, there was a possibility and even probability that evidence of its existence had been destroyed by its "explosion." [10] These conflicts were for jury decision.

An extended discussion of the law is not indicated, as appellee concedes in its brief that its defense cannot succeed unless these five elements are proven: "(1) A false representation; (2) in reference to a material fact; (3) made with knowledge of its falsity; (4) and with intent to deceive; (5) with action taken in reliance upon the representation." This accords with the appellant's argument and since all agree that this case is to be decided under Texas law and that, in considering it, we are sitting as a Texas Court, it will be sufficient if we simply list the authorities which establish these principles as the law of Texas.[11]

10. "I wish to be explicit about this, that I have stated in this autopsy protocal that I did not find an aneurysm. That does not, cannot be taken that there was not one present at one time or another because this hemorrhage which Dr. Roosth suffered was a massive thing which would, I think explosive would be the best word to describe the damage that type of thing can produce. And it is possible and it may be probable that an aneurysm existed and an aneurysm served as the weak spot through which the hemorrhage started and that the entire aneurysm was destroyed and could not be recognized at the time of the autopsy, I would say that is possible, that may be what actually happened."

11. 14 Vernon's Texas Civil Statutes, Art. 21.16 provides:
"Any provision in any contract or policy of insurance issued or contracted for in this State which provides that the answers or statements made in the application for such contract or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and

Appellant relies heavily upon the decision of this Court in Madden v. Metropolitan Life Insurance Co., 5 Cir., 1943, 138 F.2d 708, 709, 151 A.L.R. 984. A reading of the case shows that we held that "a representation, though false, does not avoid the policy unless it was made with conscious intent to deceive; that whether it was so made is normally for the jury; and that (even though a question relates to matters of fact such as whether there was a consultation rather than of opinion as to whether insured was ill or suffering from a disease), unless the evidence admits of no other conclusion than that there was an intent to deceive, it is for the jury to determine whether the answer was fraudulent in fact, that is, made with intent to deceive, or whether it was given in good faith, that is, without conscious intent to defraud."

We were there applying the law of Florida as announced in Metropolitan Life Ins. Co. v. Poole, 1941, 147 Fla. 686, 3 So.2d 386. The law of Florida as announced in that case seems to square with the law of Texas. Indeed, as above stated, there seems to be no disagreement between the parties that appellee's affirmative defense must fall unless it proved that insured made false representations to material facts with knowledge of their falsity and with intent to deceive, and that the policy was issued in reliance upon such representations. And these propositions must be established by proof which can lead reasonable minds to

only one conclusion. This, we believe, appellee has failed to do.

The contention of appellee that insured was not in good health when the policy was issued and delivered, so that it did not become effective under the terms of the policy, falls under the same analysis of facts as that set forth above in answering the contention that false answers were given in the application.

The burden was upon the appellee to sustain this contention and to show that there was no proof from which the jury could have found that insured was in good health at said time, excepting, of course, the disability under which he labored resulting from his coronary thrombosis. This phase of the law of Texas was discussed in our recent case of American Home Life Ins. Co. v. Zuniga, 5 Cir., 1955, 228 F.2d 403. Under that case and the Texas cases discussed in it, this question was also one for jury decision.

■■ Appellee labors here under the universally accepted rule that "Fraud is never presumed, and the burden [is] on appellant to prove it with reasonable certainty by a preponderance of convincing evidence." [12] That rule certainly has appropriate application here. The agent seeking to induce appellee to accept Dr. Roosth as its insured represented more than once that he was a prominent and outstanding citizen in his community. Appellee's evidence shows that he was a man of means. A good reputation does not come without effort. It results from

shall not constitute any defense to any suit brought upon such contract, unless it is shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case."

And it is provided in 14 Vernon's Texas Civil Statutes, Art. 21.18:

"No recovery upon any life, accident or health insurance policy shall ever be defeated because of any misrepresentation in the application which is of ma-

terial fact and which does not affect the risks assumed."

And see Clark v. National Life & Accident Insurance Co., 1947, 145 Tex. 575, 200 S.W.2d 820; Washington National Insurance Co. v. Anderson, Tex.Civ.App. 1936, 94 S.W.2d 263; Great Southern Life Insurance Co. v. Doyle, Tex.Com.App. 1941, 136 Tex. 377, 151 S.W.2d 197; Vann v. National Life & Accident Insurance Co., Tex.Com.App.1930, 24 S.W. 2d 347, and Coxson v. Atlanta Life Insurance Co., 1944, 142 Tex. 544, 179 S.W.2d 943.

12. Williams v. Penn Mutual Life Ins. Co., 5 Cir., 1928, 27 F.2d 1. 3.

adherence day by day to honor and decency and good faith. It ought not to be destroyed by proof which is not clear and convincing. It is a rare case which would justify the finding that, as a matter of law, a man of character has stooped to the cheap fraud relied upon here. We think that it was error for the judge so to decide. The case, in all of its aspects, should be decided by a jury.

In order that, on another trial, it may be submitted to a jury for decision the judgment of the court below is reversed and the case remanded.

Reversed and remanded.

HUTCHESON, Chief Judge (dissenting).

I agree fully with the majority that in a suit on a policy of life insurance, in order for the defendant to prevail there must be shown: a false representation, in reference to a material fact, made with knowledge of its falsity, and with intent to deceive. I agree, too, that under the controlling statutes and case law, normally these are questions of fact "to be determined by the court or jury trying the case."

As the Texas authorities show, however, while this is normally so, this does not mean that every insurance case must be sent to the jury. On the contrary, it is the established law of Texas that in the trial of such a case, as in the trial of other civil cases, uncontroverted issues are not to be submitted to a jury but are proper subjects for peremptory instructions. Tex.Jur. 41B, Sec. 401, pp. 489–494; Clark v. National Life & Accident Insurance Co., 145 Tex. 575, 200 S.W.2d 820; Jefferson Life Ins. Co. v. Kuehler, Tex.Civ.App., 298 S.W.2d 619.

Under that rule, it seems clear to me that, taken in the light most favorable to the plaintiff, it must be concluded that the evidence incontrovertibly, that is as matter of law, establishes the facts required to support the instructed verdict.

I have not overlooked the fact, of which the opinion makes so much, that the insured was recognized as a substandard risk because of his having had a coronary thrombosis in 1948. Indeed, I think this fact cuts the other way. Taken in connection with the undisputed evidence that the misrepresented fact was greatly material to, and greatly increased the substandard risk being assumed, the deliberate falsity and materiality of the representations stand starkly out. In short, it seems to me that when this case is viewed, piecemeal or as a whole, in the light of the undisputed facts of the case, including the fact admitted in appellant's brief that the insured "made misrepresentations in his application concerning (1) his failure to report his examination at Massachusetts Memorial Hospital, (2) his failure to report an examination by a physician within the past five years" and that "on these questions defendant would be entitled to an instructed verdict but for the necessity of proving that they concerned matters (1) material to the risk, (2) were made with the intent to deceive, and (3) were relied on.", it is taxing credulity far beyond its utmost limits to contend or claim that what was said and left unsaid was not done knowingly, deliberately, and with the intent to deceive.

It will serve no useful purpose to set out the evidence. The stark facts which dominate this case and force the conclusion that the district judge was right in directing a verdict, including particularly plaintiff's skill and proficiency as a doctor in the very field with which this admitted condition of his had to do, are sufficiently stated in the majority opinion. Cases which I think require the view I take are: Rhodes v. Metropolitan Life Ins. Co., 5 Cir., 172 F.2d 183; Pence v. United States, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510; McDaniel v. United States, 5 Cir., 196 F.2d 291; United States v. Stratton, 5 Cir., 232 F.2d 880.

I respectfully dissent.

Rehearing denied; HUTCHESON, Circuit Judge, dissenting.