**JEFFERSON AMUSEMENT COMPANY, Inc., et al., Plaintiffs-Appellees,**

v.

**LINCOLN NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellant,**

**First National Bank in Dallas, Intervenor-Appellee.**

No. 26335.

United States Court of Appeals
Fifth Circuit.

March 11, 1969.

Rehearing Denied July 30, 1969.

George A. Weller, Weller, Wheelus & Green, Beaumont, Tex., B. Jeff Crane, Jr., Vinson, Elkins, Weems & Searls, Houston, Tex., Michael Marchese, Jr., Fort Wayne, Ind., for defendant-appellant.

John G. Tucker, Orgain, Bell & Tucker, Beaumont, Tex., for plaintiffs-appellees.

Lawrence L. Beason, Ernest E. Figari, Jr., Dallas, Tex., for appellee, First National Bank in Dallas, Coke & Coke, Dallas, Tex., of counsel.

Before TUTTLE and GEWIN, Circuit Judges, and PITTMAN, District Judge.

PITTMAN, District Judge:

This is an appeal by the Lincoln National Life Insurance Company from a jury verdict and judgment entered by the district court. This suit was brought by Jefferson Amusement Company, Inc. and Texas Goldcoast Television, Inc. to recover the proceeds of two insurance policies. The First National Bank in Dallas, an assignee on a third policy, in-

tervened as a plaintiff after suit was commenced. All three policies were issued by Lincoln National Life Insurance Company on the life of Julius Gordon, president of Jefferson Amusement and Texas Goldcoast.

At the conclusion of the evidence the district court submitted the case to the jury, denying Lincoln's request for a directed verdict. The jury returned a verdict against Lincoln for $1,603,230.00, the face value of the three policies.

This appeal presents the following questions:

(1) Did the court err in not finding as a matter of law that the insured, Gordon, made fraudulent misrepresentations of material facts upon which the insurer, Lincoln, relied in issuing the policies?

(2) Did the court err in not finding as a matter of law that Gordon was not in good health at the time each of the policies was delivered?

(3) Did the court err in instructing the jury with respect to waiver of fraudulent misrepresentations?

(4) Did the court err in instructing the jury in the definition of an agent as it pertains to this case?

(5) Did the court err in refusing to admit testimony given by Gordon in a previous law suit?

The essential facts are as follows. On October 26, 1965, Julius Gordon applied to Lincoln for life insurance. Gordon, as president of Jefferson and Texas Goldcoast, was engaged in extensive business transactions in the course of which a loan of $1,500,000.00, secured by the stock of Texas Goldcoast, was being negotiated with the First Security National Bank. The policy for $320,000.00 in which Texas Goldcoast was the beneficiary was assigned as security, but the loan would have been approved without the assignment of the insurance. Gordon also had a commitment for the loan from another source which did not involve any insurance on his life. Gordon did not seek out the insurance. It was solicited by the defendant.

On October 26, 1965, after solicitation, Julius M. Gordon applied to the defendant for the insurance. On the basis of his application the policies of insurance involved in this case were issued; (1) policy dated September 28, 1965, in the face amount of $641,292.00, (2) a policy dated November 28, 1965, in the sum of $320,646.00 issued to Texas Goldcoast Television, Inc. as owner and beneficiary. This last policy was later assigned to the First National Bank in Dallas, the intervenor, and (3) a policy dated March 7, 1966, in the amount of $641,292.00, together with (1) supra issued to Jefferson Amusement Company, Inc. as owner and beneficiary (first issued November 30, 1965, but not accepted and re-issued on March 7, 1966).

On October 26, 1965, he was examined by two physicians appointed by Lincoln, Doctors Crager and Sargent. In answer to questions which were part of the examination, Gordon stated he had last consulted a physician or practitioner in 1963 —Dr. Crager. He also stated that to his knowledge he had never had, among other things, heart disease or chest pains. The answers were recorded by the physicians and signed by Gordon. A question on the application asked for the name of all physicians he had consulted during the last five years. He did not reveal consultations with Doctors Rafes, Pentecost, Thompson, or Chandler.

Prior to the approval and issuance of any policy in question there was an investigation for Lincoln by its underwriter Quillen, its salesman Blieden, and a retail credit company. Quillen was made aware that some of the answers to the questions were "dishonest", i. e., there were doctors who had treated Gordon who had not been reported by him in his application and Gordon's negative answer concerning a kidney flare-up. The investigation revealed Gordon had received medical treatment from Doctors Pentecost and Rafes. The information revealed Dr. Pentecost had treated him for a kidney flare-up. Quillen requested reports from these doctors. Dr. Rafes reported he had treated Gordon for a

headache. Dr. Pentecost was temporarily unavailable. Lincoln did not follow up with an interview with Dr. Pentecost and the application was approved without his report. Lincoln did nothing about taking these matters up with Gordon, Jefferson, Texas Goldcoast Television, nor taking steps to return the premium.

Dr. Pentecost was fully aware of Gordon's sexual problems and knew of the psychiatric treatment by Dr. Chandler, (He had traveled with Gordon to Dr. Chandler's clinic on one occasion.) including the use of LSD.

Agent Blieden supplied Lincoln with information with reference to Gordon's various business activities, reported he had known Gordon all his life, and he appeared to be healthy and was always a person of first class habits and reputation. He was assigned the additional duty of conducting an investigation. Blieden had known since, to wit, 1962, that Gordon had gone to a psychiatrist in California. He did not report it. He had the duty of delivering each policy and at that time determining whether or not Gordon was in good health. If he found him to be suffering from some type of illness he was not to deliver the policy. He delivered the policies and made no negative report.

Lincoln's medical examiner, Crager, was requested to disclose all facts which might disclose risks and did divulge other information concerning Gordon in addition to that filled out in the application form. Dr. Crager had been Gordon's physician for a number of years. He knew Gordon had a sexual problem for which he had sought psychiatric treatment and knew Gordon had been seeing a psychiatrist in California. At the time the application was filled out Dr. Crager did not call to Gordon's attention he had failed to list a doctor. He did not report these facts to Lincoln.

Gordon reported in the application that both of his parents died near the age of 50 from heart attacks and one sister died from a possible heart attack.

Gordon had consulted Dr. Thompson for various minor ailments such as complaints stemming from strained leg muscle, sugar in his blood being below normal, sinus, strain and tension, sore throat, cough and a tight sensation in his chest in connection with it. None of Dr. Thompson's findings indicated heart disease or anything other than minor disorders. (Dr. Chandler knew Gordon had consulted Dr. Thompson.)

The application asked only about the use of narcotic drugs to which he replied in the negative. The evidence in this case is that none of the drugs administered him by the doctors are classified as narcotics.

Gordon died on April 1, 1966, after suffering a heart attack the day before. The death certificate showed the immediate cause of death as "myocardial infarction" and the underlying cause as "arteriosclerotic heart disease."

Subsequent to Gordon's death Lincoln learned of Gordon's consultations with Doctors Thompson and Chandler which he had not disclosed. Dr. Thompson testified that on July 15, 1964, Gordon consulted him complaining of a sore throat and cough and "a tight sensation in his chest." An electrocardiogram, chest examination, and blood pressure examination were all normal. It was Dr. Thompson's opinion that Gordon was experiencing anxiety and nervousness.

Dr. Chandler, a California psychiatrist, was first consulted by Gordon in 1960 in regard to a sexual problem—one of inadequacy and frustration. Treatment by Dr. Chandler included the administration of LSD, amphetamines, ritalin, sansert, methedrine or speed, desoxyn, disoxyphedrine, ditran, and methaphetamine. The defendant's medical experts testified the drugs administered by Dr. Chandler did not have any adverse effect or contribute to Gordon's death. There was medical evidence that these drugs would cause a temporary increase in heart rate, could cause a dangerous increase in blood pressure, and could have various effects on different individuals. There was no evidence these drugs had

an adverse permanent effect or in any way contributed to the development of Gordon's arteriosclerosis.

Lincoln's senior medical director testified that had Lincoln been aware that Gordon was under treatment by Dr. Chandler, (1) for anxiety and psychosomatic symptoms, (2) and/or that he had made complaint of chest pain to Dr. Thompson (there was no evidence of chest pains as such), Lincoln would not have issued the policy at standard rates, and with that history plus the third factor, (3) had Lincoln been aware of Gordon's drug treatment by Dr. Chandler, the policies would not have been issued on any basis.

With the exception of the physician who saw Gordon for the first time on the date he had his fatal attack, each physician who had treated or examined Gordon during his lifetime and who testified, found him to be in good health with no indication of heart trouble or heart disease. There was testimony to the effect that arteriosclerosis develops slowly in some cases and rapidly in others. The first evidence of this disease in Gordon was ascertained at the time of his fatal attack and verified by the postmortem.

## CONCLUSION OF LAW

### I.

Did Gordon's failure to disclose the names of doctors who had treated him, and that he had suffered a kidney flare-up, constitute fraudulent misrepresentations of material facts which establishes as a matter of law that the district court erred in failing to give Lincoln's motion for an instructed verdict?

 This court has held in Roosth v. Lincoln National Life Insurance Co., 269 F.2d 171 (5th Cir. 1959), that for this defense to be sustained the party asserting it has the burden to prove it with reasonable certainty by a preponderance of convincing evidence, and the evidence must establish five things: (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) and with intent to deceive, (5) and with action taken in reliance upon the representation.

 There was ample evidence from which the jury could have concluded that there was no fraudulent intent on Gordon's part, to wit, (1) the applications were submitted only after solicitation by Lincoln's agent. The third and last policy in the amount of $641,292.00 was not at first accepted by Gordon, but only after an additional selling effort by Blieden approximately three months later did he agree to take the third policy, (2) the business loans which the policies were assigned to cover were not dependent on insurance assignments, (3) Gordon was a man of financial means and enjoyed a good reputation and good habits, and (4) the application made no specific inquiry concerning psychiatric treatment nor drugs of the type administered.

There was ample evidence for the jury to find the insuring of Gordon was *not* in reliance upon Gordon's false representations.

In Dossett v. Franklin Life Ins. Co., 276 S.W. 1097 (Tex.Com.App.1925), the insurer defended on the ground that certain answers in the application were false, consisting of negative answers to questions inquiring as to whether the applicant had (1) ever applied for insurance without receiving it, and (2) whether he had ever had "albumen or sugar in urine, any disease of the kidney or bladder." The evidence established that *prior to the issuance* of the policy the *company learned* the applicant had on several occasions been rejected for insurance because of albumen and casts in his urine. Additional investigation after the insured's death revealed additional companies who had examined and rejected the insured and albumen had been discovered in his urine many more times than that disclosed by their investigation prior to the issuance of the policy.

Here Lincoln had acquired knowledge that all doctors' names were not listed by Gordon. If it had followed up its investigation with Dr. Pentecost, Dr. Chand-

ler's treatment would have been revealed which in turn would have revealed Dr. Thompson's treatment.

*Dossett, supra,* further held as follows:

" * * * it is inconceivable that one can be deceived by a statement which he knows to be false. Deception necessarily follows belief. * * * (H)owever material and however false the answers of A. J. Dossett may have been, it being established that the insurance company, before it issued and delivered the policies, knew the statements and answers were false, the judgment cannot be in its favor upon those grounds."

"The argument is made * * * that because the insurance company did not know the full extent of the falsity of Dossett's answers * * * its knowledge * * * was therefore partial and would not relieve the taint of fraud. BUT this contention IS NOT SOUND * * *. The reasoning is specious.* * * "

"The insurance company * * * knew, therefore, for all purposes of reliance thereon, the answer was false. It could not thereafter be heard to say it believed the answer or relied on it at all. * * * "

"Upon discovering the utter falsity of the deceased's answers, the insurance company was free, thereafter, to pursue the inquiry or not as it preferred; but certainly thereafter its conclusion to issue and deliver the policies was not because of such answers but in spite of them. * * * " (Emphasis added.)

■ After the defendant acquired knowledge of the falsity of some of the answers it did not make further inquiry of Gordon or the beneficiaries. Upon further investigation, the company doctor and employee Blieden did not pass on all the information they had which would have disclosed the matters they complain of now. It did not follow up all its leads which would have revealed all that it knows now except the results of the postmortem.

The district court was correct in submitting these issues to the jury.

## II.

Did the district court err in failing to grant defendant's motion for instructed verdict in that Julius M. Gordon was not as a matter of law in good health at the time each of the policies involved was delivered?

The policies contained a "good health" provision which conditioned coverage upon the "insured's" being in good health at the time the policy was delivered. Lincoln contends that Gordon was in bad health at the time of the delivery, therefore, the policies never went into force.

Gordon had a thorough physical examination on February 15, 1966, two months after the first two policies were issued and less than 30 days before the issuance of the last policy. The physician's conclusion was that Gordon was not suffering from any infirmity or disease of any substantial nature which impaired his general health.

All doctors who examined Gordon prior to his fatal heart attack found him to be in good health.

Lincoln's agent, Blieden, who delivered the policies, and had the duty of ascertaining whether or not Gordon at that time was in good health, testified " * * he looked like he was healthy * * * normal. * * * "

In Great American Reserve Ins. Co. v. Britton, 406 S.W.2d 901 (Tex.1966), death was due to myocardial infarction. Two years before that policy was delivered, the examining physician testified the insured complained of chest pains and received abnormal results from an electrocardiogram. His diagnosis was angina pectoris probably due to arteriosclerosis. The court held that *good health did not mean perfect health but* a state of *health free from* any diseases or bodily *infirmities of a substantial nature* which affects the general soundness and healthfulness of the system seriously or materially, and increases the risk to be assumed by the insurer. The court

refused to hold that as a matter of law the insured was not in good health.

■ The case at bar is much less aggravated and the question of good health without question was a jury issue. Lincoln was not entitled to an instructed verdict on this ground.

### III. and IV.

Did the district court err in instructing the jury with respect to waiver of fraudulent misrepresentations and imputation of the knowledge of an agent to the principal, and,

Did the court err in instructing the jury as to the definition of an agent as it pertains to this case without regard to the character and scope of such agency?

The court charged the jury in part as follows:

"I further instruct you that if the defendant, its agent or employees, knew of any false representations or misrepresentations, or knew of such facts which would put a prudent person on inquiry and such inquiry, made with reasonable diligence, would have disclosed the falsity of the statements made by Gordon, then the defendant cannot assert the false answers to avoid the policy. The burden is on the plaintiff to prove by a preponderance of the evidence any such knowledge on the part of the defendant. Further, the defendant waives the right to assert only those false statements, if any, of which it knew or should have known."

Lincoln contends the waiver instruction was erroneous in that the jury could find waiver based upon (1) the alleged knowledge of agent Blieden; (2) by the alleged knowledge of Dr. Crager; or (3) by what was discovered by investigation or should have been discovered.

Lincoln further contends the charge failed to define the scope and authority of agent Blieden and Dr. Crager.

These contentions overlap and they will be considered together.

A Texas statute, Article 21.04, Insurance Code of the State of Texas, Vol. 14A, Vernon's Texas Civil Statutes, expressly provides that a soliciting agent "shall not have the power to waive, change or alter any of the terms and conditions of the application or policy." However, National Life Assurance Co. of Tex. v. Neves, 370 S.W.2d 144 (Tex. Civ.App.1963), has held that a soliciting agent's knowledge of an applicant's knowledge of a prior illness is imputed to his company. (Also see Traveler's Indemnity Company v. Holman, 330 F.2d 142, 149 (5th Cir. 1964).)

■ Certainly, the additional duties assigned to Blieden in connection with these policies by Quillen, after discovery of misrepresentations in the application, placed on him the duty to report all information he had to Lincoln. The inquiries made of Dr. Crager, Lincoln's medical examiner of Gordon, sought all information in his possession concerning Gordon. All information of both these men should be imputed to the company.

With reference to allowing the jury to decide if Lincoln waived the fraudulent misrepresentations by not following up its leads, this court in Apperson v. United States Fidelity & Guaranty Co., 318 F. 2d 438, 441 (5th Cir. 1963), held:

"The mere fact that the insurer makes an independent investigation * * * does not absolve the applicant from telling the truth nor lessen the right of the insurer to rely upon his representations, UNLESS THE INVESTIGATION either discloses the falsity of the representations or DISCLOSES FACTS WHICH WOULD PUT A PRUDENT PERSON ON FURTHER INQUIRY." (Emphasis added.)

■ The case at bar is readily distinguished from the New York Life Ins. Co. v. Strudel, 243 F.2d 90 (5th Cir. 1957) which held that an independent investigation by the insurer would not preclude the insurer's reliance on the application where the very nature of the inquiry was such that it was primarily

within the insured's own knowledge. From the facts heretofore set out, this knowledge was in the possession of several persons which Lincoln's leads would have revealed had it pursued them.

The court's charge sufficiently meets the objections made by Lincoln at the trial. Other objections raised here for the first time do not meet the requirements of the Federal Rules of Civil Procedure 51.

### V.

Did the court err in refusing to admit in evidence before the jury the testimony of the insured Julius Gordon contained in his deposition in ex parte Gordon v. Gordon, and in refusing to admit before the jury J. L. McAtee's testimony of statements made under oath by Gordon concerning his history of drug abuse and their effects upon him. McAtee was the court reporter who took the deposition in ex parte Gordon v. Gordon and his testimony concerned that deposition. The deposition was taken in connection with Gordon's divorce action in 1962 and contained descriptions of the treatment given him by Dr. Chandler and the manner in which the treatment affected him. The court refused to admit the deposition.

The deposition was clearly inadmissible. The parties in that proceeding and the case at bar are different, the issues are not substantially the same, and there was no motive in the divorce action to cross-examine Gordon on the issues involved in the present suit. See Roucher v. Traders & General Ins. Co., 235 F.2d 423 (5th Cir. 1956). The court did not err in refusing to admit this evidence.

Lincoln's grounds I, II, and III are predicated on the failure of the trial court to give a directed verdict in favor of the defendant. Ordinarily, directed verdicts are sought and given in those instances where the party requesting the motion does not have a burden of proof involved in the question submitted. On the propositions submitted by Lincoln, it had the burden of proof. The proper standard expressed by the Supreme Court on such a motion is:

> "When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion * * * the court should determine the proceeding by * * * directed verdict * * *." Brady v. Southern Ry. Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943).

> "Courts are reluctant to direct a verdict in favor of a party carrying the burden." 5 Moore Fed.Practice, Sec. 50.02 [1] at 2318 (2d 1968).

A more stringent standard is imposed on a movant having the burden of proof. 2B Barron & Holtzoff, Fed.Practice, Sec. 1075 at 396 (Wright's Ed. 1961).

It has been held that it is an exceptional case wherein the party on whom rests the burden of proof is entitled to a directed verdict. Grey v. First National Bank in Dallas, 393 F.2d 371, 380 (5th Cir. 1968).

We conclude that the district court did not err in any of the assigned grounds. The judgment is hereby

Affirmed.