Rosa Lee Leaman ROOSTH, Trustee and Next Friend, Appellant,

v.

AMERICAN GENERAL LIFE INSURANCE COMPANY, Appellee.

Rosa Lee Leaman ROOSTH, a Widow, Appellant,

v.

AMERICAN GENERAL LIFE INSURANCE COMPANY, Appellee.

Nos. 7128, 7129.

Court of Civil Appeals of Texas.

Texarkana.

Dec. 1, 1959.

Rehearing Denied Dec. 22, 1959.

Spruiell, Lowry, Potter, Lasater & Guinn, Tyler, for appellant.

Ramey, Brelsford, Hull & Flock, Tyler, for appellee.

CHADICK, Chief Justice.

These suits are by the beneficiaries of two insurance policies to enforce collection of the policies and recover penalty and attorney's fees. The judgments of the trial court denied a recovery against the insurance company and such judgments are affirmed.

Two separate insurance policies are involved and separate suits were filed in the trial court, by consent they were tried together pursuant to Rule 174, Vernon's Ann.Texas Rules, and the appeal reaches this court from separate judgments, but here, as in the trial court, both cases are consolidated for disposition. The common questions of law and fact being so similar, reference to the policy or the case will include both, unless the context indicates otherwise.

The case was assigned in regular order and a tentative opinion submitted with which the majority is not in agreement. The majority would affirm the case but are not in agreement upon the precise grounds therefor and separate opinions are being prepared. In an effort to economize space, I am assuming that Justice DAVIS' tentative opinion will become a dissent and together with Justice FANNING'S opinion will record a part of the

appellate review. In an effort to avoid repetition of facts and excerpts from the record and authorities found in these two opinions, I am reducing my statement to the bare essentials necessary to an understanding of the questions discussed.

In my view, Rule 274, V.A.T.R., is involved and the case turns upon the question of whether or not an objection made to a definition given by the trial judge to the jury in the course of its deliberations is sufficient as an objection to the court's failure to submit a fact issue. However, I see no way of discussing this question in an understandable way without reciting some of the facts and circumstances of the cases.

Dr. Harold Roosth, a highly-respected physician of Tyler, Texas, on two occasions applied to American General Insurance Company for life insurance. Following the applications of the assured the insurance company on March 21, 1955, issued policy No. 109,680 in the sum of $10,000 with Rosa Lee Leaman Roosth as beneficiary; and on December 9, 1956, issued policy No. 135,404 in the sum of $50,000 payable to Rosa Lee Leaman Roosth as trustee for Thomas Malcolm Roosth, Cynthia Ann Roosth, and Marleen Samea Roosth. Less than two years after issuance of the first policy, on February 7, 1957, Dr. Roosth died suddenly at the end of an uneventful business day while seated at his office desk.

The insurance company declined to make payment on the policies and the suits were instituted. It defended by denying liability generally and setting up a number of affirmative defenses, including the defense that Dr. Roosth in his written application made false statements and misrepresentations of the facts about the state of his health, previous physical examinations and consultations with physicians regarding his health and physical condition, and the cause of the death of his mother. Special issues were submitted to the jury, some of which were found favorably to Dr. Roosth and some for the insurance company. Five sets of issues submitting the various allegations of fraud were found in favor of the insurance company. It is upon the findings of fact made by the jury to these fraud issues that the trial court rendered a take-nothing judgment. No complaint is made that the jury's verdict upon these issues was not supported by the evidence. The findings in this regard are as final and binding upon this court as they were upon the trial court and there is no need to discuss the evidence which led the jury to make its findings.

For the purpose of this discussion, the fraud issues 40 to 44 on the $10,000 policy and 69 to 73 on the $50,000 policy will be referred to. Only one set of the issues will be discussed since they are the same as the others with one set applying to one policy and the second set to the other. In this series the jury found Dr. Roosth's answer in his application that childbirth was the cause of his mother's death as false; that he knew or should have known that such answer was false; and that he made such answer willfully and with intent to induce the insurance company to issue the policy; that such false answer was material to the risk insured against; and that the insurance company issued and delivered the policy in reliance upon the false answer. No objection was made by the Roosth beneficiaries that this series of fraud issues did not inquire if the answer by Dr. Roosth that his mother died of childbirth was made willfully and with design to deceive or defraud the insurance company.

After the jury retired to deliberate, the foreman addressed this written communication to the trial judge:

"May we have an interpretation of 'willfully and with intent to induce' or a dictionary definition? Prefer an interpretation."

The trial judge instructed the jury as follows:

"The term 'willfully and with intent to induce' means 'voluntarily and in-

tentionally for the purpose of influencing or persuading.' "

Counsel for the beneficiaries objected to the instruction in this language:

"Plaintiffs object to the definition of 'willfully and with intent to induce' because it fails to include the element of wrong-doing or deceit as distinguished from good faith."

It is the position of the policy beneficiaries that:

"As originally framed, the issues put to the jury the question whether Harold made the misrepresentations 'wilfully and with intent to induce the defendant to issue the policy.' This left the jury free to consider the meaning of willfully as requiring a fraudulent intent to deceive, but when the court gave the definition that 'willfully and with intent to induce' means 'voluntarily and intentionally for the purpose of influencing or persuading,' it entirely removed the vital element, the fraudulent intent to deceive."

In answer the insurance company states "if the insured knew that the statements were false and if he made them voluntarily and intentionally for the purpose of persuading the insurer to issue the policies therein sued upon, then it necessarily follows, as a matter of law, that such statements were made with the intent to deceive the insurer." The company further asserts that no controverted fact issue on intent to deceive was made by the evidence.

I have reached the conclusion that the evidence raises a controverted fact issue respecting Dr. Roosth's conscious intent to deceive the insurance company. An analysis of Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W.2d 820; Washington National Ins. Co. v. Anderson, Tex.Civ.App., 94 S.W.2d 263; wr. dis.; Great Southern Life Ins. Co. v. Doyle, Tex.Com.App., 136 Tex. 377, 151 S.W.2d 197; Vann v. National Life & Accident Ins. Co., Tex.Com.App., 24 S.W.2d 347; Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943; American Central Life Ins. Co. v. Alexander, Tex.Com.App., 56 S.W.2d 864; Imperial Life Ins. Co. v. Cartwright, Tex.Civ.App., 119 S.W.2d 683, n. w. h.; and General American Life Ins. Co. v. Martinez, Tex.Civ.App., 149 S.W.2d 637, wr. dis., judgm. cor., leads me to the conclusion that the burden was on the insurance company to plead and prove that Dr. Roosth's statement of the cause of his mother's death must have been made with the design to deceive the insurance company and unless the fact of such issue is established as a matter of law, it should have been submitted for jury determination. Bearing in mind, however, that under Rule 279 [1] Dr. Roosth's beneficiaries' failure to properly object, if they did fail, waived its submission and the issue is now to be regarded as having been tried by the court. And in the light of the judgment, if there was a failure to object, the issue must be presumed to have been found by the court favorably to the insurance company.

Rule 274 directs that a party objecting to a charge point out distinctly the matter to which he objects and the ground of his objection. It appears to me that no reasonable construction of the objection the Roosth beneficiaries made to the definition of "willfully and with intent to induce" amounts to or is the equivalent of an objection to the court's failure to submit the issue of Dr. Roosth's conscious intent to deceive. Nor does it seem reasonable to me that the objection made is calculated to put the trial judge and opposing counsel

[1]. The applicable portion of the Rule states, "If one or more of the issues necessary to sustain such ground of recovery or of defense, and necessarily referable thereto are submitted to and answered by the jury, and one or more of, such issues are omitted, without * * * objection, and there is evidence to support a finding thereon, * * * such omitted issue or issues shall be deemed as found by the court in such manner as to support the judgment."

on notice that complaint is made because the charge does not elsewhere submit the particular fact issue of conscious deceit. Its reasonable construction can only be that complaint is being made because the definition is not comprehensive enough to include the element of deceit in the issue to which it refers.

The question arises, in this connection, of whether or not the fact *issue of conscious deceit* and the fact *issue of intent to induce the insurer to issue a policy* are two separate ultimate issues or only one. I think it cannot reasonably be said that conscious intent to defraud an insurer is the same question as intent to induce the insurer to issue a policy. Some element of bad faith must be present in a factual situation supporting a conscious deceit finding; but an intent to induce the issuance of a policy could be gathered from a factual situation in which bad faith and wrongdoing are entirely absent. I understand Clark v. National Life & Accident Ins. Co., supra, American Central Life Ins. Co. v. Alexander, Tex.Com.App., 56 S.W. 2d 864, and Gorman v. Jefferson Standard Life Ins. Co., Tex.Civ.App., 275 S.W. 248, to make a distinction between the two issues and to be authority for their separate submission.

It is arguable that to define the phrase "willfully and with intent to induce" to embrace the elements of wrongdoing or deceit as distinguished from good faith would have tendered the issue of Dr. Roosth's *conscious deceit* but to have done so would have coupled it with the insurance company's fact issue on *intent to induce the insurance company to issue the policy.* Such definition would have denied the company the submission of the single issue on intent to induce in the form in which it had been given and which Roosth's beneficiaries permitted it to be submitted without objection. I think that it is clear from the cases cited that the insurance company was under a burden to prove and was entitled to have submitted an issue to determine whether or not the statement was made with the *intent of inducing the insurer to issue a policy* without intermingling or associating with it in the same special issue the fact *issue of conscious deceit.* Rule 277 provides that special issues shall be submitted distinctly and separately and on the basis of this record, the court was under a duty to so submit the various elements of the fraud issue series and to have complied with the objection to the definition by defining the phrase as suggested would have been a substantial violation of the procedural rules governing the submission of special issues.

I find no error in the trial court's overruling the objection made.

By supplemental pleading the Roosth beneficiaries invoke the law of waiver and estoppel by alleging that when the policies were issued the insurance company had actual knowledge of the fact that Harold Roosth was a patient in Massachusetts Memorial Hospital but nevertheless issued such policies and is thereby estopped to assert such fact as a defense to this suit.

Such pleading made an issue as to the knowledge, if any, the insurance company had of Dr. Roosth's attendance at the hospital and the insurance company was called upon to meet this issue by showing what, if any, knowledge it had in this respect. In doing so, the insurer introduced two reports of the Retail Credit Company dated March 17, 1955, and December 1, 1956, respectively, for the limited purpose of showing the nature and extent of the investigation the insurance company made of Dr. Roosth's applications for the two policies and not as proof of the facts recited in the reports. Objection was made that the reports concerning financial worth were immaterial to any issue in the lawsuit and injected the element of racial prejudice into the case. These reports attribute a net worth of $850,000 to Dr. Roosth and an annual earned income of $20,000 and other income of $30,000 from rentals and investments and that he is a member of a Hebrew congregation. The court instructed the ju-

ry not to consider Dr. Roosth's financial condition in determining the answers to the issues submitted to them and emphasized that the report was admitted only to evidence the scope of the investigation made by the insurance company and not as evidence of the facts stated.

There is no complaint that any allusion, invidious or otherwise, was made either to Dr. Roosth's religion or wealth at any time. I believe that the reports were admissible upon the basis on which they were allowed to go to the jury, but if I am mistaken in that, no harm is shown, and if error, their admission is not of such character as to require reversal. Rule 434.

It is also urged that the trial court committed reversible error in refusing to submit an issue as to each policy inquiring if the insurance company had actual knowledge that Dr. Roosth had been examined as a patient in Massachusetts Memorial Hospital. These issues were submitted as a part of the beneficiaries' estoppel and waiver defense to the insurance company's allegations of fraud. If the insurance company issued the policies with knowledge of the truth of misrepresentations it urges to be fraudulent, it waives or is estopped to rely upon the misrepresentations as a means of avoiding the policies. Perry v. Citizens Life Ins. Co., Tex.Civ.App., 163 S.W.2d 743, n. w. h.; Baker v. Ft. Worth Mutual Benev. Ass'n, Tex.Com.App., 115 Tex. 300, 280 S.W. 165; Terry v. Texas Prudential Ins. Co., Tex.Civ.App., 77 S.W.2d 761, wr. dis.; Union Assurance Society Limited, of London, England v. Tolivar, 5 Cir., 141 F. 2d 405.

Reference has already been made to the Roosth beneficiaries' pleading that the insurance company had knowledge of Dr. Roosth's attendance at the Massachusetts Memorial Hospital as estoppel or waiver. The jury found, as previously discussed, fraud issues concerning the representation that Dr. Roosth's mother died from childbirth. I am at a loss to relate these fraud issues to the waiver and estoppel pled. The court in a jury trial has no duty to submit any issues not made by the written pleadings and the proof.

The rule is that knowledge of some fact not in itself knowledge of the falsity of the representations made does not require an insurance company to make an investigation and exercise diligence to ascertain the truth or not of the representations. Brotherhood of Railroad Trainmen v. Roberts, 48 Tex.Civ.App. 325, 107 S.W. 626; Woodmen of the World Life Ins. Co. v. Davenport, Tex.Civ.App., 159 S.W.2d 913; Dossett v. Franklin Life Ins. Co., Tex.Com. App., 276 S.W. 1097. As I understand the authorities, knowledge that Dr. Roosth was a patient at Massachusetts Memorial Hospital was not knowledge that Dr. Roosth's mother did not die of childbirth and would not put the insurance company on inquiry to determine by a search of that hospital's records the cause of Dr. Roosth's mother's death. Knowledge that Dr. Roosth was a patient at Massachusetts Memorial Hospital to my mind bears no relation to the cause of his mother's death and would not excite inquiry nearly so much as the constructive knowledge the law imposes upon everyone, including insurance companies and their agents, that a death certificate is supposed to reveal a cause of death, and an examination of the certificate might develop facts contrary to that represented by Dr. Roosth.

The appeal as it reaches this court does not question the correctness of the jury's finding on the submitted issues nor the trial judge's findings on the omitted issues and such findings of fact are binding upon this court. No error being shown, it is the duty of this court to affirm the trial court's judgment. I would affirm. There being a majority for affirmance, an affirmance must be and is ordered.

The judgment of the trial court is affirmed.

FANNING, J., concurs in affirmance.

DAVIS, J., dissents.

FANNING, Justice (concurring).

I think the trial court entered correct judgments in favor of appellee under the record in these cases and I concur in the affirmance of the judgments of the trial court for the following reasons:

I think appellee's motions for instructed verdict were well taken and I would sustain appellee's second counterpoint, reading as follows: "The evidence was so uncontroverted as to raise no issue for the jury that the false statements made by Dr. Roosth in his application for the insurance herein involved were made with the intent to deceive the appellee insurance company." See the following authorities: Texas Prudential Ins. Co. v. Dillard, Tex., 307 S.W.2d 242; John Hancock Mutual Life Ins. Co. v. Esparza, Tex.Civ.App., 286 S.W.2d 695, wr. ref., n. r. e.; Pence v. United States, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510; McSweeney v. Prudential Ins. Co., 4 Cir., 128 F.2d 660, certiorari denied 31 U.S. 658, 63 S.Ct. 57, 87 L.Ed. 529. It is my view that the conclusion must be reached under the controlling undisputed facts in these causes that the false statements of Dr. Roosth with reference (1) to his failure to report his examination at Smithwick Foundation or Medical Associates in Boston, Massachusetts, (2) that he knowingly failed to disclose that within five years preceding the dates of the medical examiner's reports he had consulted Dr. Dera Kinsey or Dr. Reginald H. Smithwick of Boston, Mass., (3) that the cause of death of his mother was childbirth, *were not ignorantly made nor were they innocent misstatements of facts,* as in Great Southern Life Ins. Co. v. Doyle, Tex.Com.App., 136 Tex. 377, 151 S.W.2d 197; Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W. 2d 820, and other cases of like import. In this connection see the case of John Hancock Mutual Life Ins. Co. v. Esparza, supra (286 S.W.2d 695, 697), wherein it is stated:

"*Esparza's false statements were not ignorantly made, nor were they innocent misstatements of the facts,* as in

Great Southern Life Ins. Co. v. Doyle, Tex.Com.App., 136 Tex. 377, 151 S.W. 2d 197; Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W. 2d 820; Bankers Standard Life Ins. Co. v. Atwood, Tex.Civ.App., 205 S.W. 2d 74; Imperial Life Ins. Co. v. Cartwright, Tex.Civ.App., 119 S.W.2d 683; Colorado Life Co. v. Newell, Tex.Civ. App., 78 S.W.2d 1049, and other cases. He knew, when he made the misrepresentations, that he was suffering from a malady of the arm, hands and chest, that he was almost daily receiving deep X-Ray treatments at the Santa Rosa Hospital in San Antonio, that he walked each day from his home to the hospital to receive the treatments, that he had consulted and had been treated by massage, X-Ray, drugs and electrical apparatus by at least seven different doctors and that the treatments and his illness had continued up to the date of the application. The finding that Esparza did not intend to deceive is contrary to the controlling undisputed facts that he knew, intended to and did deceive the insurer in falsely answering the three material matters stated above. This Court, in an almost identical case, so ruled in American Nat. Ins. Co. v. Stevens, Tex.Civ.App., 262 S.W. 833. See also Jackson v. National Life & Accident Ins. Co., Tex.Civ.App., 161 S. W.2d 536; National Life & Accident Ins. Co. v. Burden, Tex.Civ.App., 101 S.W.2d 292; Texas Prudential Ins. Co. v. Authement, Tex.Civ.App., 64 S.W. 2d 391; Aetna Life Ins. Co. v. Shipley, Tex.Civ.App., 134 S.W.2d 342.

"The motion for judgment non obstante veredicto should have been granted. We conclude, in any event, the findings that there was no intent to deceive is against the overwhelming preponderance of the evidence. The judgment is reversed and rendered cancelling the policy." (Emphasis added.)

It was also undisputed in the evidence that the concerned matters were material to

the risk and were relied upon. It is my best judgment that the controlling undisputed facts in the cases when considered in connection with Dr. Roosth's skill and proficiency as a doctor and internist in the very field of medicine with which these cases are concerned as well as his knowledge and experience in conducting medical examinations for insurance companies on applicants for life insurance compel the conclusion from all the circumstances in the cases that what was said and left unsaid was done willfully and with the intent to induce the defendant insurance company to issue the policies of insurance. Since the conclusion seems inescapable that these false answers were knowingly made and were not ignorantly or inadvertently made, the requisite intent to deceive must be legally inferred.

If I am correct in my conclusion that appellee's second counterpoint is well taken, this conclusion would be controlling and decisive and would compel affirmance of the judgments of the trial court.

However, if I should be mistaken in my view that appellee's second counterpoint should be sustained, then I would further hold that no reversible error is presented by the record and that the judgments of the trial court should be affirmed.

The able trial court, with due judicial caution, did submit the cases to the jury upon special issues. The jury's answers to the special issues clearly authorized the trial court to render judgments for appellee herein upon more than one theory. Also appellant has not presented any points attacking the jury's findings on such issues on the grounds of "no evidence," "insufficiency of the evidence" or "that same were so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust."

I think appellant's first point does not present reversible error under this record and I would sustain appellee's counterpoint One (in reply thereto) which reads as follows:

"The Trial Court's interpretation of the phrase 'wilfully and with intent to induce,' was correct and adequate when considered in context with the remainder of the associated special issues in which such phrase was used, and in connection with the affirmative answers to the special issues immediately preceding the same."

In this connection see the following authorities: Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W.2d 820; Maniatis v. Texas Mutual Life Ins. Co., Tex.Civ.App., 90 S.W.2d 936; Universal Life & Accident Ins. Co. v. Mayse, Tex. Civ.App., 287 S.W.2d 305, wr. ref., n. r. e.; Inter-Ocean Ins. Co. v. Ross, Tex.Civ.App., 315 S.W.2d 71; Gorman v. Jefferson Standard Life Ins. Co., Tex.Civ.App., 275 S.W. 248; Pence v. United States, supra; McSweeney v. Prudential Ins. Co., supra.

In Maniatis v. Texas Mutual Life Ins. Co., supra, (90 S.W.2d 936, 938) it is stated:

"Appellant contends that the judgment cannot stand because there was neither pleading nor finding by the jury that the alleged false representations were intentionally made for the purpose of deceiving the insurer. We do not understand that this was necessary. The application contained a statement that the representations were made for the purpose of securing the insurance and should become a part of the contract, and·that, if any of the statements herein were untrue, the contract would thereby be nullified. *It was alleged and the jury found that the statements in the application were material and false, and that the insured knew that they were false when he made them, and that they were relied on by the association in issuing the policy. Clearly, if the statements were known to be false and were made for the purpose of inducing the contract and actually accomplished that purpose, as undisputably appears from·the record, the contract was procured by*

*fraud and should not be allowed to stand."* (Emphasis added.)

In McSweeney v. Prudential Ins. Co., supra (128 F.2d 660, 664, certiorari denied 317 U.S. 658, 63 S.Ct. 57, 87 L.Ed. 529), it is stated:

"We think it clear that fraud of the sort required to avoid the policy is shown to exist where there is a false representation as to a material matter, *which is false to the knowledge of the applicant* at the time it is made and which is made for the purpose of being acted on by the company. *Where these facts appear, it is idle to inquire further whether there was intent to defraud; for the intent to defraud in such case is the intent to obtain the policy by the false representations."* (Emphasis added.)

It is my view that the trial court's definition of the term "willfully and with intent to induce" was not erroneous and in no event constitutes reversible error under the record in these causes.

It is my further view that the issues as submitted comprehended "intent to deceive" and when the jury found that the statements made were false and found to the effect that Dr. Roosth *knew they were false,* it naturally followed that such answers were made with the intent to deceive. This is especially true in these cases as the record compels the conclusion that the doctor's answers were not ignorantly made nor were they made inadvertently.

Furthermore, appellant did not object to the court's failure to submit a special issue directly on conscious intent to deceive and if such an issue was necessary (which I do not think was necessary under the record in these cases) the appellant waived the same being submitted to the jury, and under Rule 279, T.R.C.P., the trial court found on said issue in support of his judgments, as pointed out by Chief Justice CHADICK in his opinion in these causes. While I would overrule appellant's first point on the

additional grounds hereinbefore stated, I do concur with the conclusion reached by Chief Justice CHADICK that appellant's first point should be overruled.

I fully agree with Chief Justice CHADICK'S discussion of appellant's 2d, 3rd, 4th and 5th points and fully agree that none of these points present reversible error under the record in these causes.

Finding no reversible error in the record in these causes and finding that the trial court entered correct judgments in favor of appellee, I concur in the affirmance of the judgments of the trial court.

DAVIS, Justice (dissenting).

This was originally written to be the opinion of the court and I file the same with minor changes as my dissent. I seriously doubt that we have reached a disposition of the case.

On March 21, 1955, appellee, American General Life Insurance Company, issued its policy No. 109,680 to Dr. Harold Roosth, insuring his life for the sum of $10,000, and payable to his wife, Rosa Lee Leaman Roosth, as beneficiary. He had previously made application for a $25,000 policy but because of a heart attack he had had the insurance rate was so high that he only took a $10,000 policy.

In 1956, Dr. Harold Roosth and a brother, Dr. Wiley Roosth, constructed a hospital in the city of Tyler at a total cost of in excess of $80,000. In November of 1956, Dr. Roosth made application to appellee for a mortgage retirement policy, but was informed that the Company would not issue to him such policy. He was informed at the same time that they would issue him additional life insurance. He made application for additional life insurance and on December 9, 1956, appellee issued its policy No. 135,404, insuring the life of Dr. Harold Roosth for the sum of $50,000 with his three children as beneficiaries.

On February 7, 1957, Dr. Roosth died of a sub-arachnoid hemorrhage. At the time

of his death, all premiums upon the aforesaid policies had been fully paid and apparently they were in full force and effect. Proofs of death were duly presented to appellee, but appellee denied liability under the terms of said policies, basing its denial upon the ground that Dr. Harold Roosth had made false answers to certain questions upon application for the insurance and alleged that he was not in good health at the time said applications were made nor at the time the policies were issued. It further alleged that he concealed from the Insurance Company the fact that he had been to a hospital for examination and treatment for abnormally high blood pressure, excessive hypertension and had a disease of the arteries.

The cases were filed under different numbers but were tried simultaneously by the trial court and they are disposed of as a single suit.

Trial was to a jury and in response to the extensive special issues, the jury rendered the following verdict:

*"Special Issue No. 1:*

"Do you find from a preponderance of the evidence that the answer of Harold Roosth to Question No. 6 contained in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter M. Bailes, Jr., dated November 28, 1956, to-wit: 'Are you now in good health and free from impairment' was false?

"Answer 'Yes' or 'No.'

*"Answer*: No.

"(Special Issues No. 2 to 5, inclusive, were not answered.)

*"Special Issue No. 6:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter

M. Bailes, Jr., dated November 28, 1956, he, the said Harold Roosth, then had or had ever had abnormal blood pressure?

"Answer 'Yes' or 'No.'

*"Answer*: Yes.

*"Special Issue No. 7:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making the answers in the Medical Reports inquired about in Special Issue No. 6, if you have so found in answer to said issue, knew or should have known that he then had or previously had had abnormal blood pressure?

"Answer 'Yes' or 'No.'

*"Answer*: Yes.

*"Special Issue No. 8:*

"Do you find from a preponderance of the evidence that Harold Roosth made such answers inquired about in Special Issue No. 6 willfully and with intent to induce the Defendant to issue the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

"Answer:  ~~No.~~  C.P.P.  Yes.

*"Special Issue No. 9:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth in said Medical Examiner's Reports which are inquired about in Special Issue No. 6 were material to the risk in issuing the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

*"Answer*: Yes.

*"Special Issue No. 10:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated December 9, 1956, in reliance upon the answers made by Harold Roosth in the Medical

Examiners' Reports inquired about in Special Issue No. 6?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"*Special Issue No. 11:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter M. Bailes, Jr., dated November 28, 1956, he, the said Harold Roosth, then had or had ever had hypertension as a disease?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"(Special Issues No. 12 to 15, inclusive, were not answered.)

"*Special Issue No. 16:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter M. Bailes, Jr., dated November 28, 1956, he, the said Harold Roosth, then had or had ever had essential hypertension?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 17:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making the answers in the Medical Reports inquired about in Special Issue No. 16, knew, or should have known that he then had or previously had had essential hypertension?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"*Special Issue No. 18:*

"Do you find from a preponderance of the evidence that Harold Roosth made such answers inquired about in Special Issue

No. 16 willfully and with intent to induce the Defendant to issue the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 19:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth in said Medical Examiners' Reports which are inquired about in Special Issue No. 16 were material to the risk in issuing the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 20:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated December 9, 1956, in reliance upon the answers made by Harold Roosth in the Medical Examiners' Reports inquired about in Special Issue No. 16?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 21:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter M. Bailes, Jr., dated November 28, 1956, he, the said Harold Roosth, then had or had ever had an indication of disease of the arteries?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"(Special Issues No. 22 to 25, inclusive, were not answered.)

"*Special Issue No. 26:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making

his answer to Question No. 9 contained in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter M. Bailes, Jr., dated November 28, 1956, failed to disclose or reveal therein that special electrocardiogram, blood pressure, X-ray and other physical tests were previously conducted upon him at the Smithwick Foundation or Medical Associates in Boston, Massachusetts?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 27:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making his answer to Question No. 9 contained in the Medical Examiners' Reports inquired about in Special Issue No. 26, knew, or should have known that special electrocardiogram, blood pressure, X-ray and other physical tests were previously conducted upon him at Smithwick Foundation or Medical Associates in Boston, Massachusetts, if you have so found in answer to the preceding issue?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 28:*

"Do you find from a preponderance of the evidence that Harold Roosth made his answers to Question No. 9 of the Medical Examiners' Reports, inquired about in Special Issue No. 26, willfully and with intent to induce the Defendant to issue the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 29:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth to Question No. 9 of said Medical Examiners' Reports, which are inquired about in Special Issue No. 26, were material

to the risk in issuing the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 30:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated December 9, 1956, in reliance upon the answers made by Harold Roosth to Question No. 9 of the Medical Examiner's Reports inquired about in Special Issue No. 26?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 31:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth to Question No. 12 contained in the Medical Examiners' Report dated November 11, 1956, and November 28, 1956, that he did not then have any physical disability other than those specifically mentioned therein, were false?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"(Special Issues No. 32 to 35, inclusive, were not answered.)

"*Special Issue No. 36:*

"Do you find from a preponderance of the evidence that Harold Roosth in making his answers to Question No. 15 in the Medical Examiner's Report of Dr. C. B. Young, dated November 11, 1956, and in the Medical Examiner's Report of Dr. Porter M. Bailes, Jr., dated November 28, 1956, knowingly failed to disclose or reveal that within five years preceding the dates of said Medical Examiners' Reports he had consulted Dr. Dera Kinsey or Dr. Reginald H. Smithwick of Boston, Massachusetts?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

*"Special Issue No. 37:*

"Do you find from a preponderance of the evidence that Harold Roosth made his answers to Question No. 15 of the Medical Examiners' Reports inquired about in Special Issue No. 36, if you have so found in answer to said issue, willfully and with intent to induce the Defendant to issue the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 38:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth to Question No. 15 of said Medical Examiners' Reports, which are inquired about in Special Issue No. 36, were material to the risk in issuing the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 39:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated December 9, 1956, in reliance upon the answers made by Harold Roosth to Question No. 15 contained in the Medical Examiner's Reports inquired about in Special Issue No. 36?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 40:*

"Do you find from a preponderance of the evidence that the answers made by Harold Roosth in the Medical Examiners' Reports of Dr. C. B. Young, dated November 11, 1956, and of Dr. Porter M. Bailes, Jr., dated November 28, 1956, that the cause of death of his mother was childbirth, were false?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 41:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making the answers in the Medical Examiners' Reports inquired about in Special Issue No. 40, if you have so found in answer to said issue, knew or should have known, that such answers were false?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 42:*

"Do you find from a preponderance of the evidence that Harold Roosth made such answers inquired about in Special Issue No. 40 willfully and with intent to induce the Defendant to issue the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 43:*

"Do you find from a preponderance of the evidence that the answers made by Harold Roosth as inquired about in Special Issue No. 40 were material to the risk in issuing the policy of insurance dated December 9, 1956?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 44:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated December 9, 1956, in reliance upon the answers made by Harold Roosth as inquired about in Special Issue No. 40?'

"Answer 'Yes' or 'No.'

*"Answer:* Yes..

*"Special Issue No. 45:*

"Do you find from a preponderance of the evidence that at the time the policy of insurance issued December 9, 1956, was delivered to him, or at the time the first pre-

mium therefor was paid, Harold Roosth was not in good health (disregarding the residual effects, if any, of his 1948 heart attack)?

"Answer 'He was not in good health' or 'He was in good health.'

"*Answer:* Yes, he was in good health.

"*Special Issue No. 46:*

"Do you find from a preponderance of the evidence that abnormal blood pressure, if any he had, was a contributing cause of the death of Harold Roosth?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"*Special Issue No. 47:*

"Do you find from a preponderance of the evidence that hypertension as a disease, if any he had, was a contributing cause of the death of Harold Roosth?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"*Special Issue No. 48:*

"Do you find from a preponderance of the evidence that a disease of the arteries, if any he had, was a contributing cause of the death of Harold Roosth?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 49:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiners' Report of Dr. C. B. Young, dated February 27, 1955, he, the said Harold Roosth, then had or had ever had abnormal blood pressure?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 50:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making

the answers in the Medical Report inquired about in Special Issue No. 49, if you have so found in answer to said issue, knew, or should have known, that he then had or previously had had abnormal blood pressure?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 51:*

"Do you find from a preponderance of the evidence that Harold Roosth made such answers inquired about in Special Issue No. 49 willfully and with intent to induce the Defendant to issue the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 52:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth in said Medical Examiner's Report, which is inquired about in Special Issue No. 49, were material to the risk in issuing the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 53:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated March 21, 1955, in reliance upon the answers made by Harold Roosth in the Medical Examiner's Report inquired about in Special Issue No. 49?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 53A:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiners' Report of Dr. C. B. Young, dated February 27, 1955, he, the

said Harold Roosth then had or had ever had essential hypertension?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 53B:*

"Do you find from a preponderance of the evidence that Harold Roosth in making the answers in the Medical Report inquired about in Special Issue No. 53A, if you have so found in answer to said issue, knew, or should have known, that he then had or previously had had essential hypertension?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"(Special Issue No. 53C was not answered.)

"*Special Issue No. 53D:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth in said Medical Examiner's Report, which is inquired about in Special Issue No. 53A, were material to the risk in issuing the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 53E:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated March 21, 1955, in reliance upon the answers made by Harold Roosth in the Medical Examiner's Report inquired about in Special Issue No. 53A?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 54:*

"Do you find from a preponderance of the evidence that when Harold Roosth made answers to the questions contained in the Medical Examiner's Report of Dr.

C. B. Young, dated February 27, 1955, he, the said Harold Roosth, then had, or had ever had hypertension as a disease?

"Answer 'Yes' or 'No.'

"*Answer:* No.

(Special Issues No. 55 to 58, inclusive, were not answered.)

"*Special Issue No. 59:*

"Do you find from a preponderance of the evidence that the answer of Harold Roosth to Question No. 14 of the Medical Examiner's Report of Dr. C. B. Young, dated February 27, 1955, to-wit: 'Are you now in good health' was false?

"Answer 'Yes' or 'No.'

"*Answer:* No.

"(Special Issues No. 60 to 63, inclusive, were not answered.)

"*Special Issue No. 64:*

"Do you find from a preponderance of the evidence that prior to the time when Harold Roosth made answers to the questions contained in the Medical Examiner's Report of Dr. C. B. Young, dated February 27, 1955, any examiner or physician had formally or informally expressed to him, the said Harold Roosth, an unfavorable opinion as to his health?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

"*Special Issue No. 65:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making the answers in the Medical Examiner's Report inquired about in Special Issue No. 64, if you have so found in answer to said issue, knew, or should have known, that an examiner or physician had, prior thereto, formally or informally, expressed to him an unfavorable opinion as to his health?

"Answer 'Yes' or 'No.'

"*Answer:* Yes.

*"Special Issue No. 66:*

"Do you find from a preponderance of the evidence that Harold Roosth made such answers inquired, about in Special Issue No. 64 willfully and with intent to induce the Defendant to issue the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 67:*

"Do you find from a preponderance of the evidence that the answers of Harold Roosth in said Medical Examiner's Report, which is inquired about in Special Issue No. 64, were material to the risk in issuing the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 68:*

"Do you find from a preponderance of the evidence that the Defendant issued the policy of insurance dated March 21, 1955, in reliance upon the answers made by Harold Roosth in the Medical Examiner's Report inquired about in Special Issue No. 64?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 69:*

"Do you find from a preponderance of the evidence that the answer made by Harold Roosth in the Medical Examiner's Report of Dr. C. B. Young, dated February 27, 1955, that the cause of the death of his mother was childbirth, was false?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 70:*

"Do you find from a preponderance of the evidence that Harold Roosth, in making the answer in the Medical Examiner's

Report, inquired about in Special Issue No. 69, if you have so found in answer to said issue, knew, or should have known, that such answer was false?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 71:*

"Do you find from a preponderance of the evidence that Harold Roosth made such answer, inquired about in Special Issue No. 69, willfully and with intent to induce the Defendant to issue the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 72:*

"Do you find from a preponderance of the evidence that the answer made by Harold Roosth as inquired about in Special Issue No. 69 was material to the risk of issuing the policy of insurance dated March 21, 1955?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 73:*

"Do you find from a preponderance of the evidence that the Defendant issued and delivered the policy of insurance dated March 21, 1955, in reliance upon the answer made by Harold Roosth as inquired about in Special Issue No. 69?

"Answer 'Yes' or 'No.'

*"Answer:* Yes.

*"Special Issue No. 74:*

"Do you find from a preponderance of the evidence that at the time the policy of insurance issued March 21, 1955, was delivered to him, or at the time the first premium therefor was paid, Harold Roosth was not in good health (Disregarding the residual effects, if any, of his 1948 heart attack)?

"Answer 'He was not in good health' or 'He was in good health.'

"*Answer*: He was in good health.

"*Special Issue No. 75*:

"What amount do you find from a preponderance of the evidence is a reasonable attorney's fee, if any, for legal services rendered by Plaintiff's attorneys in Cases Nos. 57–432 and 57–433?

"Answer in Dollars and cents, if any.

"*Answer*: $10,000."

On the basis of the foregoing jury verdict the trial court rendered judgment that appellant take nothing, hence this appeal. Many of the answers are in irreconcilable conflict.

Appellant brings forward five points of error. By Point 1 she complains of the action of the trial court in instructing the jury that the term "willfully and with the intent to induce" to mean "voluntarily and intentionally for the purpose of influencing or persuading" because said definition failed to include the element of wrongdoing or deceit as distinguished from good faith. In the court's charge, he had asked the jury in several issues whether or not Dr. Roosth made the answers to the questions asked by the examining doctors prior to the issuance of the policies if he had done so "willfully and with intent to induce" the Insurance Company to issue the policies. On the face of the record this would hardlly seem to present error, but in view of the different rulings relative to the avoidance of life insurance policies, it seems that the court erred in his definition. After the jury had started deliberating on the verdict, they asked the court for a definition of "willfully and with the intent to induce," or a dictionary. At which time they notified the court that they "prefer an interpretation." In reply to this request the trial judge gave the jury the following instructions: "The term 'willfully and with intent to induce' means 'voluntarily and intentionally for the purpose of influencing

or persuading.'" Appellant preserved her objections to such instructions.

It cannot be said that the issue of good faith, or the conscious intent to deceive, was not an issue for the jury. The evidence in the case was somewhat in conflict but there is no challenge of the sufficiency of the evidence to support the jury's findings. As to the examinations that Dr. Roosth received at the Massachusetts Memorial Hospitals it can hardly be said that he submitted himself to them for *hospitalization and treatment*. In 1950, Dr. Roosth carried a brother, Bennie Roosth, who was gravely ill and underwent a most serious operation about which Dr. Roosth, his doctor, was greatly concerned. Dr. Roosth accompanied Bennie to the Massachusetts Memorial Hospitals in 1950 and while there he requested an examination relative to his heart condition. Upon the examination, at a time when he had the tremendous strain and responsibility of caring for his brother, it was found that his blood pressure was high. But he returned to the same people with his brother Bennie for subsequent check-ups in 1951, and again in 1953, and on each occasion his blood pressure was found to be normal. He often stated that he believed himself to be in excellent health or that his health was fine.

After the heart attack in 1948, he took dicumarol daily to prevent his blood from clotting. The doctor who found his blood pressure to be high agreed that the serious stress and strain over the operation of his brother Bennie might have caused an elevation of Dr. Roosth's blood pressure. During the entire time from 1950 to the date of his death, Dr. Roosth led a normal life.

It is to be noted that the answers of the jury to Special Issues 1, 10, 11, 17, 21, 31, 47, 53b, 54 and 59 were "No." The jury found in answer to Special Issue No. 1 and No. 59 that the answers given by Dr. Roosth to the examining doctors *were not false*. The jury also answered in reply to Special Issues Nos. 45 and 74 that, disregarding the residual effects, if any, of his

1948 heart attack, he was in good health. Therefore, it seems that the instructions given by the trial court were insufficient to comply with the law. The issues came under the term of fraud. The defense of fraud based upon misrepresentation in the application are fundamental and considering such a defense that the burden of proof is upon the Insurance Company to plead and prove that the misrepresentation involved a conscious intent to deceive. Great Southern Life Ins. Co. v. Doyle, Tex.Com. App., 136 Tex. 377, 151 S.W.2d 197, and Clark v. National Life & Accident Ins. Co., 145 Tex. 575, 200 S.W.2d 820. There is an article on insurance in Vol. 11, No. 2 of Baylor Law Review, Spring Edition of 1959 at page 236 on the question of "Fraud Necessary to Avoid Life Insurance Policy." The article is by Otto Wiswell and gives a very thorough discussion of the necessary elements to defeat an insurance policy based upon the ground of false representations. The writer points out that there are five elements that the Insurance Company must plead and prove to avoid a policy for misrepresentations. They are:

"1. The making of the representations

"2. The falsity thereof

"3. Reliance thereon by the insurer

"4. *The intent to deceive on the part of the assured in making same*

"5. The materiality thereof, that is, was it material to the risk or did the fact represented contribute to the loss in maturing the policy? General American Life Ins. Co. v. Martinez (T.C.A.1941, dism. judgm. cor.), 149 S.W.2d 637." (Emphasis added.)

The word "willfully" is a word that has numerous meanings. In 94 C.J.S. pp. 620–637, the many uses of the word "willfully" are discussed. I think the word "willfully" as used in the court's charge for the purpose for which it was intended means "to denote malice" and the term in which it was used should show that the intent of Dr. Roosth was used for the perverted pur-

pose of deceiving and defrauding the Insurance Company. It was an act intentionally done for the purpose of causing injury. A conscious purpose or actual and deliberate intent on the part of Dr. Roosth to injure appellee. Great Southern Life Ins. Co. v. Doyle, Tex.Com.App., 136 Tex. 377, 151 S.W.2d 197, opinion adopted by Sup.Ct.; American Central Life Ins. Co. v. Alexander, Tex.Com.App., 56 S.W.2d 864, opinion approved by Sup.Ct.; Texas Prudential Ins. Co. v. Beach, Tex.Civ.App., 98 S.W.2d 1057, n. w. h.

To demonstrate what I have just said, the word "willfully" is defined in Webster's Dictionary as: "1. of free will, voluntarily, readily. 2. by design; intentionally; of set purpose. 3. in willful obstinate or perverse manner; stubbornly; obstinate. 4. *In law, (a) purposefully with the intent of effecting a specific result;* (b) maliciously; in direct opposition to unquestionable law." (Emphasis added.) The court's instruction of the word "willfully" "with intent to induce" to mean "voluntarily and intentionally for the purpose of influencing or persuading" would hardly come within the definition of "willfully" as a matter of law. "Voluntarily" is defined in Webster's Dictionary as "spontaneously; of one's own will; without being moved, influenced or impelled by others." "Intentionally" is defined by Webster as: "By design; or purpose; not casually." "Influencing" is described by Webster as: "To exercise influence on; to modify or affect in some way; to act on; to bias; to sway; as, the sun influences the tides; to influence a person by fears or hopes."

Persuading is defined by Webster as: "(1) to influence by argument, advice, entreaty, or expostulation; to draw or incline the will of to a determination by presenting motives to the mind. (2) To convince by argument or reason offered, to convince by reasons suggested by reflection or by deliberation, or by evidence presented in any manner to the mind. 3. To inculcate by argument or expostulation."

"Deceive" is defined by Webster to mean: "1. To mislead; to cause to err; to impose on; to delude; to cheat. 2. To beguile; to divert; to while away."

As pointed out in Roosth v. Lincoln Nat. Life Ins. Co., 5 Cir., 1959, 269 F.2d 171, that the intent of the mind of Dr. Roosth at the time he made the answers must be considered from the viewpoint of what was in his mind when he gave them. Unless appellee intended to waive this important finding, then the issue was not sufficient because it did not possess the intent to deceive at the time the answers were given.

Each of the policies contained the following provision: "All statements made in application for this policy, in the absence of fraud, are deemed representations and not warranties."

At the time Dr. Roosth was examined by two doctors for each of the policies issued, they did not find any high blood pressure. Of course, the jury found that he did not die from high blood pressure. The jury found that he died from a disease of the arteries and the doctors testified that if he had such a disease he could not have known it. Thus it seems the misstatements, if any, made in the application, were not productive of the death. 24–B Tex.Jur. 437, Sec. 202 deals with the *warranty* of the insured that he is in good health is enforceable regardless of the purpose or intent with which they were made. The jury found him to be in good health. Atlanta Mutual Ins. Ass'n v. Heard, Tex.Civ.App., 40 S.W.2d 927. I would sustain the point of error.

By Points 3, 4 and 5, appellant complains of the action of the trial court in refusing to submit his special requested issues Nos. 1 and 2 as to whether or not the appellee had actual knowledge that Harold Roosth had been examined in Massachusetts Memorial Hospitals at the time the policies were issued, and in No. 5 she complained of the action of the trial court because he did not include Massachusetts Memorial Hospitals in the charge but instead used Smithwick and Medical Associates, members of the Massachusetts Memorial Hospitals. Points 3 and 4 present what I think to be reversible error. Upon the trial of the case, appellee offered in evidence a letter from Dr. Arthur Ruskin, a doctor for Dr. Harold Roosth, to the attention of Dr. Ghent Graves, Medical Director for the appellee. The letter is as follows:

"February 24, 1955.
"American General Life Ins. Co.
"P.O. Box 1931
"Houston 1, Texas
"Attn: Dr. Ghent Graves, Medical Director

"Dear Dr. Graves:

"Dr. Roosth has been under my care since December 2, 1949, at which time the second ECG sent you was taken. He had a myocardial infarction in August 1948; was treated in Tyler and recovered uneventfully. At that time G.O. series, gall bladder series, barium enema, all negative. I have seen him frequently until June 1954. During all this time he has never had any symptoms and his physical examination, including size of heart and fluroscopy of the heart have always been negative except for blood pressure findings— highest on December 2, 1949, 150/100, but always since then below 140/90. He has taken excellent care of himself, including prolonged anti-coagulant therapy under my direction. Report from Massachusetts Memorial Hospitals on June *1943* noted essentially the same findings and ECG (Q2 and Q3). Urinalysis, blood count and sedimentation rates all normal. Prompt return of ECGs will be appreciated.

"With best wishes,
    "Sincerely yours

    "/s/ Arthur Ruskin, M.D.
      "Arthur Ruskin, M.D.
      "Asso. Prof. Int. Med.
      "Univ. of Tex.Med.Br.
        "Galveston, Texas."

I will first point out that at the time the lawyers went to take the deposition of any one in connection with the examination, they first reported to Massachusetts Memorial Hospitals to get the records from the library. There they took the deposition of Miss Joyce Gromley. Miss Gromley was the Chief Medical Record Librarian. From her they secured all the information pertaining to the examination of Dr. Roosth. Then, they proceeded to take the deposition of the doctors.

Now, back to the points particularly raised relative to the issues of fact, I quote from Roosth v. Lincoln Nat. Life Ins. Co., supra, as follows:

"If insured was suffering from hypertension, there was ample proof that it was not essential hypertension, that is, chronic or persistent, amounting to a disease; but was occasional hypertension resulting from the fact that he was a tense individual, reacting spontaneously to such stimuli as worry, excitement, frustration. Those closest to him stated that he appeared to be in good health, led a normal life, and did not direct his effort at avoiding strain and tension which would ordinarily be expected of a doctor who suspected that he was the victim of essential hypertension. The foregoing brief analysis demonstrates that reasonable minds would probably reach different conclusions with respect to the questions whether insured had hypertension at all and if so, its character; whether he knew of the condition if it existed and considered it important; whether he deemed it a part of the thrombosis episode and other like questions. That being so, they presented issues of fact and not of law.

"The testimony of Dr. Ruskin was of particular importance to appellant. He was a professor in the University of Texas and had written some eighty papers on cardio vascular diseases. He first examined insured in 1949 and continued to see him and confer with him through the years until the end of 1956. He had never found any evidence from his extended examinations that insured had hypertension in any form, and it had never been mentioned to him. While on the stand he told of writing a letter in February, 1955 to American General Life Insurance Company, which is reproduced in the margin.

"Mr. Balay, underwriter for Lincoln National, admitted that the letter was in Lincoln's file. The letter was submitted to Lincoln by American in connection with insured's application to American for insurance. Lincoln reinsured a great many of American General's risks, and it was the practice of the two companies to exchange information. Mr. Balay also was examined concerning confidential reports made by investigators who had contacted people who were close to the insured and the report showed him to be a man in apparent good health and one who worked regularly.

"This letter of Dr. Ruskin's, taken in connection with the underwriter's testimony, would warrant the finding by the jury that the insurer was in possession of facts sufficient to put it upon inquiry at the Massachusetts Memorial Hospital, and that failure to do so would amount to a waiver of the claim that the appellant is barred from recovery by failure of the insured to reveal the examinations made in Boston. At all events, the evidence has persuasive force towards warranting the jury in finding that the insurer did not rely on such failure of the insured to disclose the fact of said examination.

"A careful reading of the entire episode involving the examinations by insured in Boston leads to the conclusion that failure to reveal these examinations is not nearly as damaging to appellant's case as the Company contends. At all events, the evidence, con-

sidered in connection with the counter-vailing proof on appellant's behalf, raises nothing more than a jury question on this phase of the case." [269 F.2d 176.]

And this was the same Dr. Roosth as involved in this case under consideration.

I concur in the statement by Chief Justice CHADICK that Dr. Roosth was a highly-respected physician. But I cannot agree that Rule 279 assumes that any issue not submitted to the jury was tried by the trial judge. The issue of conscious intent to deceive was a defensive issue. Where the defendant did not request such an issue, the issue was waived. Hall v. Hall, Tex.Civ. App., 298 S.W.2d 950, reversed on other grounds, Tex., 308 S.W.2d 12. There is nothing in the charge that refers to any intent to deceive the Insurance Company. I am unable to go along on the *assumption* that the trial court tried such an issue. As pointed out in Roosth v. Lincoln National Life Insurance Co., 5 Cir., 1959, 269 F.2d 171, the issue of intent to deceive was for the jury. If the issue was waived by the appellee, judgment should be here rendered for the appellants.

It seems that the laws of Texas and Florida are different from those of other states and the holding on the direct issue of intent to deceive are mandatory.

There is no issue on the intent to deceive the Company about the statements made by Dr. Roosth about the death of his mother. The only doctor who testified about her death plainly explained how childbirth could easily bring about the condition from which she died. This was also spoken of in Roosth v. Lincoln National Life Insurance Co., supra. To deny the insurance on the finding of the jury on this issue cannot be conceived by me.

Appellee does not concede in its brief here that it cannot maintain the judgment of the trial court unless the five fundamental elements are pleaded and proven: "(1)

a false representation; (2) in reference to material fact; (3) made with knowledge of its falsity; (4) with intent to deceive; (5) with action taken in reliance upon the representations." Although it seems that they made such concessions in the case of Roosth v. Lincoln National Life Insurance Co., supra, under the Texas statutes, upon which the Roosth v. Lincoln case, supra, was decided, I find the following:

"*Art. 21.16.* Misrepresentation by Policyholder

"Any provision in any contract or policy of insurance issued or contracted for in this State which provides that the answers or statements made in the application for such contract or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented * * * or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case."

"*Art. 21.18.* Immaterial Misrepresentation

"No recovery upon any life, accident or health insurance policy shall ever be defeated because of any misrepresentation in the application which is of an immaterial fact and which does not affect the risks assumed."

From these articles it can be readily seen that the contentions of the parties and the representations made be a material part of the risk. The case of Madden v. Metropolitan Life Ins. Co., 5 Cir., 1943, 138 F.2d 708, 151 A.L.R. 984, shows that the court held that "a representation, though false, does not avoid the policy unless it was made with conscious intent to deceive; that

**672**

whether it was so made is normally for the jury; and that (even though a question relates to matters of fact such as whether there was a consultation rather than an opinion as to whether insured was ill or suffered from a disease), unless the evidence admits of no other conclusion than that there was an intent to deceive, it is for the jury to determine whether the answer was fraudulent in fact, that is, made with intent to deceive, or whether it was given in good faith, that is, without conscious intent to defraud."

It seems that the courts of Texas have put some rather insignificant meanings to the letter of the statutes. In Texas Prudential Ins. Co. v. Dillard, Tex., 307 S.W.2d 242, our Supreme Court reversed and rendered a cause in which the answer of the jury that the insured on the date of the application was in good health, and made other favorable answers. The trial court and the Courts of Civil Appeals rendered judgment in favor of the beneficiary. In that case Justices Calvert, Smith and Walker dissented; Judge Greenhill not sitting. Although in other cases such as Pioneer American Ins. Co. v. Meeker, Tex.Civ.App., 300 S.W.2d 212, wr. dis., and Trinity Reserve Life Ins. Co. v. Hicks, Tex.Civ.App., 297 S.W.2d 345, n. w. h., the courts hold that the insured must make the false statements with the specific intent to deceive the Insurance Company.

Believing that the issues of fact were presented as to whether or not the Insurance Company had notice of the examination, I would sustain Points 3 and 4. I think that Point 5 is possessed of some merit and suggest that on another trial the error complained of here be cured.

By Point 2, appellant complains of the action of the trial court in admitting into evidence appellee's exhibits Nos. 32 and 33, being private investigation reports of the Retail Merchants' Credit Association upon application of Dr. Roosth for insurance. Under the present pleadings and evidence in the record, these exhibits were not admissi-

ble for any purpose and the trial court should have sustained an objection to them. I would sustain the point.

I dissent from the opinion of the majority in affirming the case.